J-A13015-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MICHAEL TIMMONDS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AGCO CORPORATION D/B/A AND OR | : | No. 2916 EDA 2019 |
| F/K/A MASSEY FERGUSON, INC., | : | |
| M.M. WEAVER & SONS, INC., | : | |
| SPORTING VALLEY TURF FARMS, | : | |
| INC.,  HUMMER SPORTS SURACES, | : | |
| LLC., AND HUMMER TURFGRASS | : | |
| SYSTEMS, INC. | : | |

Appeal from the Judgment Dated November 22, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 151103681

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED:  APRIL 12, 2021**

Michael Timmonds appeals from the judgment,[1] entered in the Court of

Common Pleas of Philadelphia County, after a jury returned a verdict in favor

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Timmonds filed his notice of appeal on September 25, 2019, following the trial court's denial of his post-trial motions.  On November 13, 2019, this Court issued an order, noting that final judgment had not been entered on the trial court docket as required by Pa.R.A.P. 301, and directing Timmonds to file a praecipe to enter judgement with the trial court prothonotary.  Timmonds complied with that order on November 22, 2019.  Pursuant to Pa.R.A.P. 905(a)(5), we may treat Timmonds' prematurely-filed notice of appeal as filed after the entry of judgment.  **See** Pa.R.A.P. 905(a)(5) ("A notice of appeal filed after the announcement of a determination but before the entry of an

of Appellees, AGCO Corporation, d/b/a and/or f/k/a Massey Ferguson, Inc. ("AGCO"), M.M. Weaver & Sons, Inc. ("Weaver"), Sporting Valley Turf Farms, Inc., Hummer Sports Surfaces, LLC, and Hummer Turfgrass Systems, Inc. (collectively, "Turf Defendants").  Upon careful review, we affirm.

The matter before the Court stems from injuries Timmonds sustained in the course of his employment with George E. Ley Co. ("Ley").[2]  Specifically, on March 19, 2015, Timmonds was performing irrigation work at Flying Hills Golf Course, which required him to use a tractor for the displacement and loading of dirt.  *See* Amended Complaint, 4/14/16, at ¶¶ 1-3.  Timmonds attempted to start the tractor, manufactured by AGCO (model number MF-451) and owned by Ley.  In order to start the tractor, Timmonds positioned himself in the seat and turned the key in the ignition.  *See* N.T. Jury Trial, 6/6/18, at 9.  The tractor failed to start.  *See id.*  As a result, Timmonds dismounted the tractor in order to use a "rigging method" to start the ignition, which entailed touching a wire to the tractor's solenoid.[3]  Amended Complaint,

_____

appealable order shall be treated as filed after such entry and on the day thereof.").

[2] Ley was originally named as a defendant in this matter, but was ultimately dismissed by stipulation of the parties.  *See* Stipulation, 4/12/16.

[3] "Tractor solenoids connect the starter directly to the battery [when starting the engine].  Starters require a significant amount of current to operate— current that is too large to send through a standard ignition switch.  Doing so would burn out the ignition switch within seconds.  Solenoids solve this problem by using a low electric current to activate a high-current switch."

- 2 -

*supra*, at ¶ 6; N.T. Jury Trial, 6/6/18, at 9. When Timmonds did so, the tractor "immediately took off and ran over" him. N.T. Jury Trial, 6/6/18, at 10. As a result, Timmonds suffered injuries to his left foot which required multiple surgeries and for which he continues to require pain medication. *See id.* at 12-14.

Timmonds filed suit in the Court of Common Pleas of Philadelphia County. Following discovery and the disposition of numerous pretrial motions, trial commenced on June 4, 2018. At trial, Timmonds pursued claims of negligence and products liability against AGCO and Weaver, and a negligence claim against the Turf Defendants.[4] Relevant to this appeal, Timmonds' claims

---

https://itstillruns.com/how-to-wire-a-tractor-solenoid-13404543.html (last visited 3/12/21).

It is undisputed that, at the time of its manufacture, the tractor came with a guard that was bolted over the starter solenoid to prevent "hot-wiring." This guard came with a label, warning against removal of the guard and cautioning against hot-wire starts. At the time of Timmonds' accident, the guard had been removed to allow a user to utilize a wire to connect the terminals on the starter solenoid to "hot-wire" the machine when it would not start using the key. This method allows the current to flow directly from the battery to the starter mower and will start the tractor if the key switch is in the "on" position. It also bypasses the neutral start system, which is a safety system designed to prevent accidents, such as the one that occurred in this case, by preventing the tractor from starting while it is in gear. The identity of the party who removed the solenoid cover was a key issue in this case.

[4] While post-trial motions were pending with the trial court, Timmonds reached a settlement with Weaver and the Turf Defendants. Accordingly, Timmonds' claims on appeal related solely to AGCO.

against AGCO were based on AGCO's failure to incorporate an occupant presence control ("OPC")[5] on the tractor.

Timmonds presents the following questions for our review:

1. Whether the trial court erred as a matter of law in denying [Timmonds'] motion for a new trial stemming from the trial court's improper dismissal of [his] claim of negligence against defendant AGCO by means of a directed verdict?

2. Whether the trial court prejudicially erred as a matter of law or abused its discretion, thereby entitling [Timmonds] to the remedy of a new trial, in improperly instructing the jury concerning the elements of a product[s] liability claim?

3. Whether the trial court prejudicially erred as a matter of law or abused its discretion, thereby entitling [Timmonds] to the remedy of a new trial, in permitting defendants to argue that the negligent actions and inactions of [Ley] were responsible for [Timmonds'] injuries and damages, even though the worker's compensation bar precluded [Timmonds] from recovering in tort against [Ley], and [Ley] was neither a party to this suit at the time of trial nor shown on the jury verdict slip as a potentially liable party?

4. Whether the trial court prejudicially erred as a matter of law or abused its discretion, thereby entitling [Timmonds] to the remedy of a new trial, in barring [Timmonds'] counsel from impeaching AGCO's expert witness with the report of another expert that AGCO's expert reviewed and considered in reaching his own expert opinions?

Brief of Appellant, at 4-5.

Timmonds first claims that the trial court erred in denying his motion for a new trial based on his assertion that the court improperly granted a

---

[5] An OPC "is a design to neutralize a machine . . . whenever an operator is not present." N.T. Jury Trial, 6/11/18, at 6. As relevant to this case, an OPC would have prevented the tractor from starting unless Timmonds had been sitting in the tractor's seat, thus preventing the accident from occurring.

directed verdict in favor of AGCO on Timmonds' negligence claim. We begin

by noting our standard of review:

> In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in the light most favorable to the verdict winner. Our standard[s] of review when considering the motions for a directed verdict and judgment notwithstanding the verdict [JNOV] are identical. We will reverse a trial court's grant or denial of a [directed verdict or JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.
>
>> There are two bases upon which a [directed verdict or JNOV] can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.
>
> *Campisi v. Acme Markets, Inc.*, 915 A.2d 117, 119 (Pa. Super. 2006) (quotation omitted). *See Berg v. Nationwide Mutual Insurance Co., Inc.*, 44 A.3d 1164 (Pa. Super. 2012).

*Hall v. Episcopal Long Term Care*, 54 A.3d 381, 395 (Pa. Super. 2012)

(brackets in original).

Timmonds raised claims against AGCO sounding in both negligence and

strict products liability. "[I]n order to maintain a negligence action, the

plaintiff must show that the defendant had a duty to conform to a certain

standard of conduct; that the defendant breached that duty; that such breach

- 5 -

caused the injury in question; and actual loss or damage." ***Phillips v. Cricket***

***Lighters***, 841 A.2d 1000, 1008 (Pa. 2003).

> Of these four elements, the primary one is whether the defendant owed a duty of care. ***Althaus v. Cohen***, [] 756 A.2d 1166, 1168 ([Pa.] 2000). To determine whether the defendant owed a duty of care, we must weigh the following five factors: "(1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution." ***Id.*** at 1169. No one of these five factors is dispositive. Rather, a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant.

***Phillips***, 841 A.2d at 1008-09.

Our Supreme Court, in ***Webb v. Zern***, 220 A.2d 853 (Pa. 1966), formally adopted Section 402A of the Restatement (Second) of Torts as the law governing strict products liability actions. This section provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
>> (a) the seller is engaged in the business of selling such a product, and
>>
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>>
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts, § 402A (1965). To prevail on a strict products liability claim, a plaintiff must prove that the product was defective, the defect existed when it left the defendant's hands, and the defect caused the harm. ***Barton v. Lowe's Home Centers, Inc.***, 124 A.3d 349, 354–55 (Pa. Super. 2015). The threshold inquiry in all products liability cases is whether there is a defect. Where, as here, the plaintiff alleges a design defect, he must demonstrate that the design of the machine results in an unreasonably dangerous product. ***Id.***

As a preliminary matter, we will begin by addressing AGCO's claim that, following our Supreme Court's decision in ***Tincher v. Omega Flex***, 104 A.3d 328 (Pa. 2014), Timmonds was not entitled to simultaneously proceed with both a common law negligent design claim and a strict liability claim under section 402A of the Restatement (Second) of Torts.[6] In ***Tincher***, our Supreme Court overruled the long-standing precedent set forth in ***Azzarello v. Black Brothers Co.***, 391 A.2d 1020 (Pa. 1978), in which the Court imposed a strict segregation between negligence and strict liability concepts by removing from the purview of the jury the question of whether a product was "unreasonably dangerous" and placing that determination in the hands of the trial court to

---

[6] The trial court acknowledged AGCO's ***Tincher*** argument, but explicitly stated in its opinion that "in rendering the at-issue directed verdict, [it] **made no determination that the post-*Tincher* landscape precluded the simultaneous submission of a negligent design theory and a 402A theory**[.]" Trial Court Opinion, 8/27/19, at 15 (emphasis in original). Rather, the court simply determined that Timmonds "had not met his burden to send the negligent design theory to the jury." ***Id.***

be determined as a question of law. The Court reasoned that "the phrases 'defective condition' and 'unreasonably dangerous' as used in the Restatement formulation are terms of art" whose "resolution depends upon social policy," and thus "do not fall within the orbit of a factual dispute which is properly assigned to the jury for resolution." *Azzarello*, 391 A.2d at 1026, overruled by *Tincher*, *supra*.

In *Tincher*, the Supreme Court revisited the scheme established in *Azzarello*. The Court noted that the *Azzarello* holding was "premised . . . on the assumption that the term 'unreasonably dangerous' is misleading to jurors because it 'tends to suggest considerations which are usually identified with the law of negligence.'" *Tincher*, 104 A.3d at 376. Such negligence-based rhetoric, in the view of the *Azzarello* Court, "saddle[d] a plaintiff in a strict liability case with an additional and unwarranted burden of proof in every case." *Id.* at 377. The *Tincher* Court observed, however, that the facts of *Azzarello*, "when viewed with the appropriate judicial modesty, did not require such a broad pronouncement." *Id.* (noting issue of "jury confusion" in *Azzarello* "arose in a distinct, fact-bound context of a jury trial in which claims of strict liability and counter-claims of negligence were asserted against distinct parties"). The Court concluded that the rule established by *Azzarello* was overbroad, impracticable, and based on "unsupported assumptions and conclusory statements." *Id.* at 380. Accordingly, the Court reformulated its approach to the standard of proof relevant to strict liability actions and returned to the finder of fact the question of whether a product is in a

"defective condition unreasonably dangerous."  In doing so, the Court crafted a new test for proving whether a product is in a defective condition under section 402A of the Restatement (Second) of Torts:

> The plaintiff may prove defective condition by showing either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer [("consumer expectations test")], or that (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions [("risk-utility test")].

*Id.* at 335.  The Court further stated:

> Whether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue.  Thus, the trial court is relegated to its traditional role of determining issues of law, e.g., on dispositive motions, and articulating the law for the jury, premised upon the governing legal theory, the facts adduced at trial and relevant advocacy by the parties.

*Id.*

In support of his claim that he is entitled to a new trial as to his negligence claim, even though his strict liability claim was rejected by the jury, Timmonds relies on our Supreme Court's decision in **Phillips**, **supra**.  In that case, the plaintiff brought claims sounding in, *inter alia*, strict products liability and negligence.  In granting the defendant's motion for summary judgment, the trial court held that the plaintiff had failed to establish a strict liability claim.  The court then reasoned that, where a product is found to be not defective for strict liability purposes, a design defect claim sounding in

negligence also must fail.  Accordingly, the court granted summary judgment on both claims.

On appeal, this Court held that the trial court had erred in dismissing the strict liability claim.  The Court further reasoned that, since it had found the trial court's determination on strict liability to be erroneous, it must necessarily reverse the entry of summary judgment on the negligent design claim.

On allowance of appeal, the Supreme Court reversed the holding of this Court as to the plaintiff's strict liability claim, concluding that the trial court had properly granted summary judgment in favor of the defendant.  However, the Court rejected the argument that, if the trial court "properly granted summary judgment on [plaintiff's] strict liability claim, then perforce we must hold that her negligence claim also fails."  **Phillips**, 841 A.2d at 1008.  The Court stated:

> This reasoning is deeply flawed and we decline to adopt it.  As we discussed *supra*, negligence and strict liability are distinct legal theories.  Strict liability examines the product itself, and sternly eschews considerations of the reasonableness of the conduct of the manufacturer.  In contrast, a negligence cause of action revolves around an examination of the conduct of the defendant.  Were we to dispose of a negligence claim merely by an examination of the product, without inquiring into the reasonableness of the manufacturer's conduct in creating and distributing such a product, we would be divorcing our analysis from the elements of the tort.  Thus, as the elements of the causes of action are quite distinct, it would be illogical for us to dispose of [plaintiff's] negligence claim based solely on our disposition of her strict liability claim.  Instead, we must examine the law of negligence and determine whether the trial court erroneously

> determined that [plaintiff's] negligence claim failed as a matter of law.

***Id.*** (internal citation omitted).

Here, AGCO argues that, because ***Phillips*** was decided while ***Azzarello*** was the prevailing law on strict products liability, it is no longer applicable in a post-***Tincher*** landscape. AGCO asserts that "[e]ssential to the reasoning of the ***Phillips*** Court was the then-existing bright[-]line rule that courts must maintain a strict divide between negligence and strict liability concepts by preventing any negligence theories—like that of an unreasonably dangerous product—from being injected into a 402A design defect case." Brief of Appellee, at 16. Because ***Tincher*** "overruled ***Azzarello*** and with it, the absolute prohibition on mixing negligence and strict liability concepts," AGCO argues, a plaintiff may no longer proceed on strict liability and negligence claims on the same facts. ***Id.*** We disagree.

The elements of proof in strict products liability and negligence causes of action are separate and distinct. As set forth above, to prevail on a claim sounding in negligence, a plaintiff must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage. ***Phillips***, ***supra***. To prevail on a strict products liability claim, a plaintiff must prove that the product was defective, the defect existed when it left the defendant's hands, and the defect caused the harm. ***Barton***, ***supra***. In short, negligence focuses on conduct, while strict liability examines the product itself. Thus, although ***Tincher*** eliminated the doctrinal wall between

- 11 -

strict liability and negligence concepts erected by the ***Azzarello*** Court, nothing in the Court's decision suggests an intention to consequently eliminate negligence-based product-design causes of action. Indeed, the Court acknowledged that "[t]he duty spoken of in strict liability is intended to be distinct from the duty of care in negligence." ***Tincher***, 104 A.3d at 383, citing Restatement (Second) of Torts § 402A(2) (stating seller may be subject to liability even though it has exercised all possible care in the preparation and sale of his product); ***see also Tincher***, 104 A.3d at 384 ("In Pennsylvania, the question of whether those who make or market products have duties in strict liability (**in addition to negligence**) has been answered in the affirmative by the 1966 decision in ***Webb***.") (emphasis added). Because ***Tincher*** clearly contemplates the continued viability of negligence-based product-design actions, we reject AGCO's assertion that "negligent design and strict liability design defect are the same thing." Brief of Appellee, at 17.

Having determined that ***Tincher*** does not bar Timmonds from proceeding under theories of both strict liability and negligence, we now turn to his claim that the trial court erred in granting a directed verdict as to his claim that AGCO negligently designed the tractor without an OPC.

In issuing its directed verdict in favor of AGCO, the trial court concluded that Timmonds failed to set forth the requisite elements of a common law negligence claim against ACGO. Specifically, the court found that the testimony of Timmonds' expert witness, Kevin Sevart, was solely "directed toward establishing [Timmonds'] products liability claim under [s]ection

- 12 -

402A," a claim separate and distinct from one asserting common law negligence. Trial Court Opinion, 8/27/19, at 18. The court found that Timmonds "failed to set forth how AGCO, an agricultural tractor manufacturer, failed to conform to a certain standard of conduct," as required to establish negligence. *Id.* at 18-19. In particular, the court emphasized the lack of any testimony by Sevart as to a relevant standard of care, and noted that Sevart had, in fact, conceded that AGCO "had not breached any technical, manufacturing or industry standards."[7] *Id.* at 19.

Timmonds argues that he did, in fact, establish all four elements of his negligence claim. First, he asserts that he was a foreseeable user of the tractor and that, under Pennsylvania law, a manufacturer owes a duty to the intended user of its products. Second, Timmonds alleges that the element of breach was established by the testimony of his expert witness, Sevart, who testified that AGCO "should have included on the tractor an [OPC] or similar safety feature that would have required a driver to be present in the tractor's seat before the machine would start." Brief of Appellant, at 17. Finally,

_____

[7] The court stated:

> The only person who could set forth duty [as to AGCO] is your expert. And all I heard your expert talk about was the issues about the seat. And [he] never used the words [']they were negligent because they didn't put this on.['] Not once . . . did he ever use that word.

Trial Court Opinion, 8/27/19, at 19, quoting N.T. Jury Trial, 9/18/18, at 33-34.

- 13 -

Timmonds argues, "there is no dispute that [he] sustained a serious injury and resulting damages, thereby satisfying the final two elements of a *prima facie* negligence claim." ***Id.*** at 18.

In response, AGCO argues that the trial court properly granted a directed verdict because AGCO did not owe Timmons—an unintended, untrained, and unqualified user of the tractor—a duty to incorporate an OPC into its product. AGCO posits that, unlike in strict liability cases under section 402A, in which "a manufacturer owes a duty to all intended and reasonably foreseeable users to make a reasonably safe product, a manufacturer does not necessarily owe that same duty in negligence." Brief of Appellee, at 20. Rather, the court must consider the five factors set forth in ***Althaus***, ***supra***, which AGCO argues all militate in its favor. With respect to the first ***Althaus*** factor—the relationship between the parties—AGCO asserts that Timmonds was neither the purchaser of the tractor, nor a "trained, qualified[,] or intended user of it." Brief of Appellee, at 22. As to the second ***Althaus*** factor—social utility—AGCO argues that "[t]here is no question that an agricultural utility [t]ractor like the MF 451 is a useful product." ***Id.*** In particular, the fact that tractor was "purposefully manufactured without an OPC has a particular social utility because it allows farmers to use the tractor as a stationary power source [to operate] various implements off the [power take off] without [requiring a driver] in the seat of the [t]ractor." ***Id.*** at 22-23. AGCO asserts that the third ***Althaus*** factor—nature of the risk and foreseeability—also weighs in its favor. Specifically, AGCO claims that the

social utility of the tractor is high, while the foreseeability of harm is low because "the [t]ractor contained myriad safety features[8] specifically designed" to prevent an accident like Timmonds', and that "[i]t was only when all of these [safety features] were bypassed or ignored that the accident could occur." *Id.* at 23. With regard to the fourth *Althaus* factor—consequences of imposing a duty upon the defendant—AGCO argues that "allowing this [t]ractor to be manufactured with an OPC actually would make it more dangerous."[9] *Id.* at 24. Finally, as to the fifth *Althaus* factor—public interest—AGCO asserts that "[t]he public has a clear interest in farmers having access to tractors that allow them to get the job done." *Id.* at 25.

Lastly, AGCO posits, even assuming, *arguendo*, that AGCO owed Timmons "some general duty of care," a directed verdict was still appropriate, as Timmonds "did not adduce evidence sufficient to define what the duty was

---

[8] In particular, AGCO cites the following safety features present on the tractor at the time of manufacture: (1) a bolted-on metal guard covering the area Timmonds accessed in order to hotwire the tractor; (2) a warning decal affixed to the metal guard warning the user to only start the tractor with a key from the seat and to ensure that the transmission and PTO are in neutral because "Starting in gear kills"; (3) a manual; (4) a neutral start system that would "prevent forward motion of the machine unless [sic] all gears were in neutral." Brief of Appellee, at 23-24.

[9] AGCO cites the testimony of its Director of Product Safety and Standards, David Murray, in support of this assertion. Murray testified that, if an OPC were present, the tractor could turn off and lose power steering and anti-lock brakes if the operator hit a pothole and bounced out of the seat, with dangerous consequences if he was "towing thousands of pounds down the road." *Id.* at 25. Moreover, Murray testified that "if an operator or user is insistent on bypassing safety mechanisms[, . . . he could] easily bypass the OPC by putting a brick or a lunch pail or any weight on the seat." *Id.*

and how AGCO breached it." *Id.* at 14. Rather, Timmonds' sole expert, Sevart, "focused on one thing and one thing only[:] AGCO's failure to put an [OPC] in the [t]ractor." *Id.* at 27. Sevart "offered no testimony on the standard of care of a manufacturer like AGCO in designing products or on how AGCO breached that standard of care in its design of the [t]ractor." *Id.* Accordingly, AGCO asserts, Timmonds' negligence claim fails.

The trial court granted a directed verdict based on the failure of Timmonds' expert witness, Sevart, to testify that AGCO had breached any technical, manufacturing or industry standard of care. However, while "[c]ompliance with [a] statute or regulation is admissible as evidence of [an] actor's exercise of due care, . . . such compliance 'does not prevent a finding of negligence where a reasonable [person] would take additional precautions.'" *Bourgeois v. Snow Time, Inc.*, 242 A.3d 637, 658 (Pa. 2020), quoting *Berkebile v. Brantly Helicopter Corp.*, 281 A.2d 707, 710 (Pa. Super. 1971) (holding Superior Court erred in concluding lack of testimony as to industry standards precludes finding of negligence for failure to establish duty of care; rather, defendant's duty "was not to comply with industry standards[, but] to exercise reasonable care to protect its patrons against unreasonable risks that its conduct of using rubber mats to decelerate snow tubers created"). Accordingly, because AGCO's compliance—or lack thereof—with industry standards is not dispositive of Timmonds' negligence claim, we must proceed with a full analysis of the elements necessary to establish a negligence claim.

The first element of the negligence analysis requires us to determine whether AGCO owed a duty of care to Timmonds. Under Pennsylvania law, in determining whether such a duty exists, we are required to consider the following five factors: (1) the relationship between the parties; (2) the social utility of the defendant's conduct; (3) the nature of the risk imposed and the foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the defendant; and (5) the overall public interest in the proposed solution. **Althaus**, 756 A.2d at 1169. "No one of these five factors is dispositive. Rather, a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant." **Phillips**, 841 A.2d at 1008–09. Here, we are constrained to conclude that Timmonds has waived his claim that AGCO owed him a duty under Pennsylvania law. Accordingly, he is unable to demonstrate that the trial court erred in granting a directed verdict on his negligence claim.

It is an appellant's duty to present arguments that are sufficiently developed for our review. **In re R.D.**, 44 A.3d 657, 674 (Pa. Super. 2012). "The brief must support the claims with pertinent discussion, with references to the record[,] and with citations to legal authorities." **Id.** This Court "will not act as counsel and will not develop arguments on behalf of an appellant." **Commonwealth v. Hardy**, 918 A.2d 766, 771 (Pa. Super. 2007). Moreover, "[i]t is not this Court's responsibility to comb through the record seeking the factual underpinnings of [an appellant's] claim." **Irwin Union Nat. Bank & Tr. Co. v. Famous**, 4 A.3d 1099, 1103 (Pa. Super. 2010). "It is not the role

of this Court to develop an appellant's argument where the brief provides mere cursory legal discussion." *Lechowicz v. Moser*, 164 A.3d 1271, 1276 (Pa. Super. 2017). When defects in a brief impede our ability to conduct meaningful appellate review, we may find issues to be waived. *Hardy*, 918 A.2d at 771.

In order to ascertain whether AGCO owed a duty to Timmonds, an analysis of the *Althaus* factors is required. Timmonds' analysis of the duty element of negligence consists, in its entirety, of the following:

> The first element [duty,] is easily satisfied here. Timmonds was a foreseeable user of [AGCO's] tractor, and the evidence at trial established that AGCO was aware that its tractor frequently failed to start using its key and that users were therefore required to use the far more dangerous bypass method to start the tractor. Pennsylvania law establishes that a manufacturer owes a duty to the intended user of its products. The Supreme Court has recognized a five-factor test to determine the existence of a duty between parties. The determination of whether a duty exists in a particular case involves weighing: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution. *Althaus*[, 756 A.2d at 1169].

Brief of Appellant, at 17.

Timmonds accurately recites the correct legal principle governing this Court's determination as to the existence of a duty; however, having done so, he fails to take the required next step of applying that legal principle to the record in such a way as to facilitate appellate review of his claim. Timmonds' failure to address the *Althaus* factors essentially leaves this Court in the

position of considering a theoretical claim, particularly where the trial court, likewise, did not address the factors. This Court has previously observed that courts "are 'least well suited' for determining whether a duty exists as a matter of law because it 'is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations.'" *Charlie v. Erie Ins. Exch*., 100 A.3d 244, 251 (Pa. Super. 2014) (citation omitted). Accordingly, "the default position of our courts is that, unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors favorably predominating, we will not impose new affirmative duties." *Id.* at 252 (citation and brackets omitted). Where, as here, the party advocating for the existence of a duty has utterly failed to provide the Court with any analysis of the issue within the confines of the applicable legal framework, it would be imprudent and, indeed, inappropriate to embark on that analysis ourselves.

In sum, because Timmonds' argument as to the existence of a duty on the part of AGCO lacks analysis of the relevant law, we find his claim as to the trial court's grant of a directed verdict on his negligence-based cause of action waived.

Timmonds next asserts that the trial court erred by improperly instructing the jury concerning the elements of a product liability claim. Specifically, Timmonds asserts that the instructions given by the trial court were not consistent with the state of the law post-*Tincher* because they "omitted most of the fundamentally important factors the Supreme Court

established in Tincher that a jury should consider in conducting the risk-benefit analysis." Brief of Appellant, at 36.

Regarding challenges to a trial court's jury instructions, our Supreme Court has instructed:

> Error in a charge is sufficient ground for a new trial if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. Error will be found where the jury was probably [misled] by what the trial judge charged or where there was an omission in the charge. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to a fundamental error. In reviewing a trial court's charge to the jury[,] we must look to the charge in its entirety.

*Tincher v. Omega Flex, Inc.*, 180 A.3d 386, 397–98 (Pa. Super. 2018) ("*Tincher II*"), quoting *Passarello v. Grumbine*, 87 A.3d 285, 296–97 (Pa. 2014).

The objective of a jury charge "is to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict." *Tincher*, 104 A.3d at 351. The charge "defines the legal universe in which a jury operates for the purposes of the verdict." *Id.* at 347 n.5. Where evidence supports an instruction on a theory or defense, a charge on the theory or defense is warranted. *Id.* at 408. At that point, "[t]he trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Id.*

> [W]hen the propriety of the jury instruction of the trial court is at issue, those instructions must be viewed *in toto* to determine if

any error has been committed. Unless the charge as a whole can be demonstrated to have caused prejudicial error, we will not reverse for isolated inaccuracies.

*Wilkerson v. Allied Van Lines, Inc.*, 521 A.2d 25, 32 (Pa. Super. 1987).

Here, Timmonds argues that the court's instruction on the risk-benefit standard was incomplete, as it "omitted most of the fundamentally important factors the Supreme Court established in *Tincher*." Brief of Appellant, at 36. However, Timmonds fails to specify which factors the court omitted, how the evidence supported their inclusion, *Tincher*, *supra* (proposed charge must be supported by evidence), or the manner in which he was prejudiced by the omission of those factors. *Wilkerson*, *supra* (appellant must demonstrate prejudice). Rather, Timmonds simply reproduces his requested instruction, as well as the instruction given by the trial court, and summarily asks us to find that the latter was lacking because it did not include "all seven of the risk-benefit factors that the Supreme Court's *Tincher* ruling viewed as relevant, [which] prejudicially deprived [him] of his right to have the jury evaluate the evidence of product defect under the legal test" mandated by *Tincher*. Brief of Appellant, at 37. Accordingly, for the same reasons we deemed Timmonds' first claim waived, we similarly conclude that his argument here lacks analysis of relevant law as applied to the facts of the case. Thus, his claim that the trial court's jury instructions were improper as to the risk-benefit standard is waived.

Moreover, during the jury charge conference, Timmonds' counsel agreed to the court's proposed jury instruction on the risk-utility factors, which was virtually identical to the charge given at trial:

[COUNSEL FOR TIMMONDS]: I'm assuming once we—can Your Honor read back where we are?

THE COURT: We haven't left where we started.

The tractor was unreasonably dangerous if a reasonable person would conclude that the probability and seriousness of harm by the product outweigh the burden of taking precautions. **You may consider the following factors: [t]he seriousness of the potential harm resulting from the use of the product; the likelihood that the harm would occur; the feasibility of an alternative safer design at the time of manufacture or sale of the product; the cost of an alternative design; and the disadvantages of an alternate design.**

[COUNSEL FOR AGCO]: We are good with that.

[COUNSEL FOR TIMMONDS]: **Yes, Your Honor**.

N.T. Jury Trial, 6/18/18, at 77-78 (emphasis added). At trial, the court instructed the jury, in relevant part, as follows:

[THE COURT:] The second[ theory]—remember it's and/or not an and—the tractor was unreasonably dangerous because a reasonable person would conclude that the possibility and seriousness of harm posed by the product as designed outweighed the burden or cost of taking precautions. You may consider the following factors: **The seriousness of the potential harm resulting from the foreseeable use of the product as designed; the likelihood that the harm would occur when used in a foreseeable manner; the feasibility of an alternative safer design or other safety precautions at the time of manufacture or sale of the product; the cost of an alternate design or other safety precautions, and disadvantages of an alternate design or other safety precautions.**

- 22 -

N.T. Jury Trial, 6/19/18, at 202-03 (emphasis added).

In order to preserve an issue for appellate review, a litigant must place a timely, specific objection on the record. *See Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 45 (Pa. 2011); *Straub v. Cherne Indus.*, 880 A.2d 561, 566 (Pa. 2005). Issues that are not preserved by specific objection in the lower court are waived. Pa.R.A.P. 302(a); *Straub*, 880 A.2d at 617-18. Because counsel did not object to the court's proposed instruction—and, in fact, indicated his agreement to it—we conclude that, for this reason also, Timmonds has waived his claim.

Next, Timmonds asserts that the trial court erred by failing to preclude the admission of evidence regarding the negligence of his employer, Ley, and allowing cross-examination and argument by defense counsel with regard thereto.

> [The a]dmission of evidence is within the sound discretion of the trial court and a trial court's rulings on the admission of evidence will not be overturned absent an abuse of discretion or misapplication of law. *Schuenemann v. Dreemz, LLC*, 34 A.3d 94, 100–01 (Pa. Super. 2011). An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias[,] or ill-will, as shown by the evidence or the record, discretion is abused. *Id.*

*Maisano v. Avery*, 204 A.3d 515, 523 (Pa. Super. 2019). For a trial court's evidentiary ruling to constitute reversible error, the ruling must not only be erroneous, but also harmful to the complaining party. *Whitaker v.*

***Frankford Hosp. of City of Philadelphia***, 984 A.2d 512, 522 (Pa. Super. 2009).

The Pennsylvania Rules of Evidence provide that, generally, all relevant evidence is admissible, ***see*** Pa.R.E. 402, and that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. However, a court "may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Here, Timmonds asserts that the testimony in question was barred by section 303 of the Workers' Compensation Act.[10] Section 303 makes compensation under the Act the exclusive remedy whenever an employee is injured within scope of his employment and bars third parties from joining employers as additional defendants or seeing apportionment against them.[11]

---

[10] 77 P.S. §§ 1-2710.

[11] Section 303 provides as follows:

(a) The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employe[e]s, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death as defined in section[s] 301(c)(1) and (2) or occupational disease as defined in section 108.3

- 24 -

Prior to trial, Ley was dismissed from the action by stipulation after it became clear that any claim against it was barred by section 303. Thereafter, Timmonds filed pre-trial motions *in limine*, arguing that defendants should be precluded from offering "evidence, argument, or testimony that [Ley] was negligent or otherwise at fault for [Timmonds'] injuries." Brief of Appellant, at 38. The trial court denied those motions.[12] Timmonds argues that this ruling was in error, as such evidence "is explicitly and unequivocally barred by long-established Pennsylvania case law about the apportionment of liability to a plaintiff's employer when the employer is immune from suit under [s]ection 303(b) of [the Act]." *Id.* at 43. Timmonds asserts that "[t]he Pennsylvania Supreme Court has made it clear that any evidence of [Timmonds'] employer's negligence should have had absolutely no place in this trial[,] was wholly

_____

(b) In the event injury or death to an employe[e] is caused by a third party, then such employe[e], his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to receive damages by reason thereof, may bring their action at law against such third party, but the employer, his insurance carrier, their servants and agents, employe[e]s, representatives acting on their behalf or at their request shall not be liable to a third party for damages, contribution, or indemnity in any action at law, or otherwise, unless liability for such damages, contributions or indemnity shall be expressly provided for in a written contract entered into by the party alleged to be liable prior to the date of the occurrence which gave rise to the action.

77 P.S. § 481 (footnotes omitted).

[12] The court denied Timmonds' motions without prejudice to his right to raise appropriate objections at trial, concluding that the purported conduct of Ley was relevant to the factual cause of Timmonds' accident. *See* Trial Court Opinion, 8/27/19, at 39.

- 25 -

irrelevant[,] and should not have been used by defendants to offset their liability for [Timmonds'] accident and injuries." **Id.** at 46. Timmonds further argues that, "[e]ven if there were arguably some marginal relevance of evidence, argument[,] or testimony that [Timmonds'] employer was negligent—despite the Supreme Court['s] . . . repeated holdings to the contrary—such relevance is vastly outweighed by the danger of unfair prejudice, confusing the issues[,] and misleading the jury." **Id.** at 46-47.

The trial court concluded that, while section 303 precludes a third party from bringing an action in tort or seeking apportionment against an employer, it does not, by its terms, preclude a third party from contesting the actual cause of injuries or contesting that a plaintiff has met his burden of proof regarding the cause of the incident in issue. **See** Trial Court Opinion, at 40. Because evidence of Ley's actions was relevant to causation and did not unfairly prejudice Timmonds, the court concluded that the evidence was admissible, articulating its reasoning as follows:

> The instant claim presented a thorny evidentiary landscape due to the differing legal claims among the parties. [Timmonds'] theories of liability as to AGCO were related solely to the production of a defectively designed product. [Timmonds'] theories of liability as to MM Weaver were twofold: one was based on the sale of a defectively designed product and the other was an independent claim of negligence for the sale of the tractor without a guard or manual. [Timmonds'] theory of liability as to the Turf Defendants was that they had removed the guard and resold the tractor back to MM Weaver without the guard. AGCO's primary defenses were that the product had been changed substantially by the removal of the guard and that [Timmonds'] hotwiring/jumpstarting of the tractor was not an intended use, and this combined misuse was the sole cause of the accident. The Turf Defendants' and MM

- 26 -

Weaver's primary defenses were that Ley, or one of [Timmonds']
co-workers, had removed the guard, not them; therefore,
[Timmonds] could not meet his burden of proving that the conduct
of either the Turf Defendants[] or MM Weaver, prior to the sale to
Ley, was a factual cause of the incident. Accordingly, this [c]ourt
ruled that evidence of Ley's actions and/or inactions concerning
the removal of the guard was **relevant to the causation
defenses and that the probative value far outweighed any
prejudice to [Timmonds].** It was the above legal theories
pursued by [Timmonds], and the concomitant defenses, that
guided this [c]ourt's evidentiary rulings as to relevance.

. . .

[Timmonds] alleged that the Turf Defendants were negligent in
removing the guard covering the solenoid starter sometime
between 2006 and 2008 when the Turf Defendants had the at-
issue tractor [in its possession]. [Timmonds] also alleged that MM
Weaver was negligent for selling the at-issue tractor to Ley in
2008 without the guard covering the solenoid starter and/or
without the operator manual. In a negligence action, [a plaintiff]
has the burden of proving, by a preponderance of the evidence,
that the harm suffered was due to the conduct of the defendant.
The assessment of whether [a p]laintiff has met this burden is
most often a jury determination, unless "it is clear that reasonable
minds could not differ on the issue." As stated by our Supreme
Court, "[i]n establishing a *prima facie* case, the plaintiff need not
exclude every possible explanation of the accident; it is enough
that reasonable minds are able to conclude that the
preponderance o the evidence shows defendant's conduct to have
been a substantial cause of harm to the plaintiff." Here, the
determination of liability in [Timmonds'] negligence claims for the
absence of the guard and manual required the jury to assess when
the guard and the manual were removed and by whom.
Accordingly, evidence of Ley's actions and/or inactions concerning
the removal of the guard and the manual were critical to [the
defenses of] MM Weaver and Turf Defendants [] related to their
own liability.

Moreover, because [Timmonds] was pursuing negligence claims
against Turf Defendants and MM Weaver, these [d]efendants were
pursuing their own claims of comparative negligence against
[Timmonds] with regard to his operation of the tractor. To defend
against the claims of comparative negligence, [Timmonds] himself

- 27 -

introduced evidence that he only jumpstarted the tractor because of his employer's instructions, thereby interjecting Ley's lackluster training of employees and Ley's condoning of the purported misuse.[13]

*Id.* at 41-42 (emphasis in original). We concur with the trial court's analysis that the evidence was relevant to the issue of causation and that its probative value was not outweighed by a danger of unfair prejudice to Timmonds.[14]

Moreover, Timmonds is unable to demonstrate that the evidence is barred by section 303 of the Act. First, section 303(b) does not preclude the introduction, in a case seeking damages from a third party, of evidence regarding an employer's negligence, where such evidence is relevant to

---

[13] For example, Timmonds' counsel elicited testimony regarding the deficiency of Ley's safety practices from Jeffrey Immel, Ley's project manager on the job site at which Timmonds was injured:

Q: Did you ever receive any training from anyone as to how to use this tractor?

A: No. Not another tractor to use [*sic*].

Q: Did you or anyone with Ley, to the best of your knowledge, ever give Mr. Timmonds any training in how to use that tractor?

A: I don't know that he was or wasn't.

Q: You certainly didn't give him any training, though?

A: No.

N.T. Jury Trial, 6/5/18, at 47.

[14] We note that Timmonds' argument as to unfair prejudice consists of a single paragraph in which he summarily states that the relevance of evidence in question was "vastly outweighed by the danger of unfair prejudice, confusing the issues and misleading the jury." Brief of Appellant, at 46-47. Because Timmonds fails to develop an argument as to the legal or factual basis for this assertion, any claim regarding unfair prejudice is waived. **Hardy**, **supra**.

defenses raised by the third party. Rather, the statute simply precludes a third party from either bringing an action or seeking apportionment against an employer. Second, none of the cases relied upon by Timmonds addresses the admissibility of evidence of an employer's negligence where it is relevant to another party's defense. **See Tsarnas v. Jones & Laughlin Steel Corp.**, 412 A.2d 1094 (Pa. 1980) (upholding constitutionality of section 303 and affirming dismissal of third-party complaint seeking to join employer as additional defendant); **Heckendorn v. Consolidated Rail Corp.**, 465 A.2d 609 (Pa. 1983) (holding section 303 precludes joinder of employer as additional defendant for purposes of apportioning fault), and **Bell v. Koppers Co.**, 392 A.2d 1380 (Pa. 1978) (holding section 303 did not bar joinder of employer in suit where injuries occurred prior to effective date and suit was filed subsequent to effective date).

For the foregoing reasons, Timmonds' claim that the trial court erred in admitting evidence regarding Ley's negligence is without merit.

Finally, Timmonds claims that the trial court erred in barring his counsel from impeaching AGCO's expert witness with the report of another, non-testifying expert, retained by another defendant, whose report AGCO's expert purportedly reviewed and considered in reaching his own expert opinion. Timmonds asserts that this evidence should have been admitted to "directly impeach the false assertions regarding plaintiff's recommended alternate design made" by AGCO's expert. Brief of Appellant, at 50. He is entitled to no relief.

Some background is in order. Prior to trial, AGCO's co-defendant, Weaver, obtained an expert report from Mark Ezra, P.E., and John F. Huffman, P.E., for use in a potential cross-claim against AGCO. In that report, Ezra and Huffman concluded that the tractor was defective and that the defect was, in part, the cause of Timmonds' injuries. They further opined that the use of OPC would have reduced the risk of injury to Timmonds. Weaver ultimately decided not to pursue its cross-claim and, consequently, did not present testimony from either Ezra or Huffman.

At trial, AGCO presented David Murray as an expert in tractor and agricultural design and safety. On direct examination, Murray never referred to the Ezra/Huffman report or stated that he had relied upon it in formulating his opinion. On cross-examination, Timmonds' counsel attempted to question Murray regarding whether he had reviewed the Ezra/Huffman report. Counsel for AGCO objected, and the trial court sustained the objection on the basis that the opinions contained in the report were inadmissible hearsay, not subject to any exception. The following exchanges then took place:

> [COUNSEL FOR TIMMONDS]: Did you review any reports, other than Mr. Sevart['s], which discuss—I'm not going to get into what they say—which discuss occupant presence controls?
>
> [COUNSEL FOR WEAVER]: Same objection. Simply a different way of phrasing something.
>
> THE COURT: No. Did he review any other reports; yes or no?
>
> [COUNSEL FOR TIMMONDS]: Regarding OPC.
>
> A: I saw the report.

Q: As an engineer, am I correct as a safety director, that if someone comes forth, other than Mr. Sevart, and said OPS was necessary technology that rendered your product defective, that is something you would consider, right?

A: **I would consider it on its merits**.

. . .

Q: In your industry, am I correct that Mr. Sevart is not the only one that has been advocating for OPCs for decades?

A: I don't have a name to give you. **I assume that's correct, yes**.

Q: You don't have a name to give me. Do you have two names?

A: Excuse me?

[COUNSEL FOR AGCO]: Objection.

THE COURT: Does he know any names, is that what you're asking?

[COUNSEL FOR TIMMONDS]: He said a name. I'm wondering if there [are] two.

THE COURT: Or three or five. Is there a significance about the number?

[MURRAY]: So I do remember a report by Mr. Sevart or his father and one of their colleagues, if I remember right, if that's correct.

[COUNSEL FOR TIMMONDS]: And you know there [have] been reports from people other than Mr. Sevart and his colleagues, right, discussing OPC—

N.T. Jury Trial, 6/13/18, at 69-70, 73-73 (emphasis added). At this point, the court interjected, excused the jury, and asked counsel to move on. Subsequently, the court reaffirmed its previous ruling that Murray could not be questioned specifically regarding the Ezra/Huffman report, and counsel for Timmonds declined to re-cross-examine Murray.

Timmonds now asserts that the trial court's ruling precluded him from impeaching Murray. Specifically, Timmonds argues that, during his testimony,

> Murray repeatedly opined that OPC was not required on the Massey Ferguson 451 tractor at issue. During cross[-]examination, Murray acknowledged that, before testifying, he reviewed and considered other expert reports in this case, including the reports provided by co-defendant M.M. Weaver of Mr. Huffman and Mr. Ezra. Mr. Murray specifically confirmed that he read and "considered on its merits" the report on OPC by Mr. Huffman and Mr. Ezra. Yet, upon further examination, [Murray] told the jury that the only people advocating for OPC's inclusion on Massey Ferguson tractors are associated with plaintiff's expert witness, Mr. Sevart.
>
> . . .
>
> The testimony of Mr. Murray stated to the jury that Mr. Sevart's report is the only evidence that he has reviewed which indicates that the subject tractor is defective for not including OPC. This was plainly untrue. [The Ezra/Huffman report] clearly impeaches this testimony and provides that the Massey Ferguson 451 tractor was unreasonably dangerous and defective. Huffman and Ezra further opine that a proper design alternative would have been the inclusion of an [OPC]. Huffman and Ezra confirm that OPC is a reliable system. These expert conclusions, offered by a defendant's witnesses, directly impeach the false assertions regarding [Timmonds'] recommended alternate design made by Mr. Murray.

Brief of Appellant, at 48, 50 (citations to reproduced record omitted). Timmonds is entitled to no relief.

A review of the trial transcripts reveals that Timmonds' claim is based on a mischaracterization of Murray's testimony. First, Murray did not "specifically confirm" that he read and "considered on its merits" the Ezra/Huffman report. Rather, when asked, generally, if he had reviewed any

other reports discussing OPC, he stated that he "saw the report." N.T. Jury Trial, 6/13/18, at 70. Counsel then asked, in hypothetical form, whether Murray would consider an opinion that OPC was necessary and that its absence rendered the tractor defective. Murray replied using the conditional tense: "I would consider it on its merits." ***Id.*** Subsequently, when counsel asked Murray if it was correct that Sevart was not the only person advocating for the inclusion of OPC, Murray responded that, while he could not provide a specific name, he "assume[d] that's correct." ***Id.*** at 73.

It is clear from the foregoing that Murray: (1) did not testify that he considered the Ezra/Huffman report on its merits in arriving at his expert opinion and (2) did not deny that there were others in the industry, aside from Sevart and his associates, who believed that OPC was a desirable safety feature for tractors such as the one in question. Contrary to Timmonds' argument, there no "obvious contradiction" in Murray's testimony. Brief of Appellant, at 50. Simply put, Murray's statements were not inconsistent and provided no basis for impeachment. Accordingly, we can discern no prejudice that could have inured to Timmonds as a result of the trial court's ruling, and, for that reason alone, his claim must fail. ***Whitaker***, ***supra*** (for trial court's evidentiary ruling to constitute reversible error, ruling must not only be erroneous, but also harmful to complaining party).

Moreover, the legal basis for the court's decision to disallow the testimony is sound. Specifically, the case upon which Timmonds bases his claim, ***Boucher v. Pennsylvania Hosp.***, 831 A.2d 623 (Pa. Super. 2003), is

distinguishable. As the trial court thoroughly and correctly addresses this issue in its comprehensive Rule 1925(a) opinion, *see* Trial Court Opinion, 8/27/19, at 20-29, we rely upon that analysis in further finding that Timmonds is entitled to no relief on this claim. The parties are instructed to attach a copy of that opinion in the event of further proceedings.

Judgment affirmed.

Judge Strassburger did not participate in the consideration or decision of this Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/12/21

Filed 11/1/2019 5:00:00 PM Superior Court Eastern District
2916 EDA 2019

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| MICHAEL TIMMONDS<br>*Plaintiff* | : <br>: <br>: | NOVEMBER TERM, 2015<br>NO. 03681 |
| v. | : <br>: | CONTROL NO. 18070276 |
| AGCO CORPORATION, et al.<br>*Defendants* | : <br>: <br>: <br>: | OPINION IN SUPPORT OF<br>DENIAL OF PLAINTIFF'S<br>MOTION FOR A NEW TRIAL |

## OPINION

CARPENTER, J.                                                                    AUGUST 27, 2019

In March 2015, Plaintiff Michael Timmonds was injured by an AGCO Massey Ferguson 451 Agricultural Utility Tractor while attempting to hotwire/jumpstart/bypass start the tractor while it was in gear. From June 1, 2018 to June 20, 2018, Plaintiff tried his case before this Court against the manufacturer of the tractor (AGCO), the seller of the tractor (MM Weaver), and a previous owner of the tractor (Turf Defendants). At the heart of the case was whether the movement of the at-issue tractor during Plaintiff's hotwire/jumpstart/bypass was a foreseeable event or whether the movement of the tractor resulted from either an unintended misuse and/or a substantial change (removal of a safety guard) after the tractor left the manufacturer's possession. Also at issue, was whether Turf Defendants, or another entity, removed the guard and whether the tractor had an operator manual at the time it was sold to Plaintiff's employer in 2008. On June 20, 2018, the jury rendered verdict in favor of Defendants and against Plaintiff. Plaintiff has filed the instant post-trial motion seeking a new trial on the following issues:

2

1. This Court improperly directed verdict on Plaintiff's claim of negligence against Defendant AGCO.
2. This Court improperly limited the cross-examination of Defendant AGCO's expert witness.
3. This Court improperly instructed the jury regarding the elements of a products liability claim.
4. This Court improperly denied Plaintiff's pre-trial Motion to Preclude Admission of Evidence Regarding the Negligence of George E. Ley Co..
5. This Court improperly admitted evidence of Plaintiff's prior bad acts / character.

For the reasons that follow, this Court has denied Plaintiff's request.

## PROCEDURAL HISTORY

### i. Pre-Trial

On November 25, 2015, Plaintiff Michael Timmonds filed his initial Complaint against his employer, Defendant George E. Ley Co.("Ley"), the purported owner of the tractor, Eastern Irrigation and Pump Company, LLC ("Eastern Irrigation"), and the manufacturer of the tractor, AGCO Corporation d/b/a and/or f/k/a Massey Ferguson, Inc. ("AGCO"). The initial Complaint set forth a claim of Negligence against Ley and Eastern Irrigation and claims of Products Liability, Negligence, and Breach of Warranty against AGCO. Plaintiff's claims against Ley were eventually dismissed after several rounds of Preliminary Objections and Stipulations among the various parties.[1]

---

[1] On January 6, 2016, Ley and Eastern Irrigation filed Preliminary Objections to Plaintiff's Complaint, to which Plaintiff filed his opposition on January 27, 2016. A Rule was issued regarding the issue of venue/jurisdiction for March 28, 2016 and continued to April 27, 2016. On April 12, 2016, Plaintiff, AGCO, Ley, and Eastern Irrigation entered a Stipulation that all claims and crossclaims against Ley were dismissed without prejudice. On April 27, 2016, Eastern Irrigation filed a supplemental memorandum in support of the Preliminary Objections and Plaintiff filed a supplemental memorandum in opposition to the Preliminary Objections. On August 2, 2016, the Hon. John Younge docketed an Order overruling the Preliminary Objections. On February 9, 2016, AGCO filed an Answer with New Matter and Crossclaim against Defendants Ley and Eastern Irrigation. On February 12, 2016, Ley and Eastern Irrigation filed and Answer to the Crossclaim and, on February 25, 2016, Plaintiff filed a Reply to New Matter. On April 12, 2016, Plaintiff, AGCO, and the Eastern Irrigation entered a Stipulation that all claims and crossclaims against Ley were dismissed.

3

On April 14, 2016, Plaintiff filed an Amended Complaint reflecting the dismissal of Ley. The Amended Complaint again asserted a claim of Negligence against Eastern Irrigation and claims of Products Liability, Negligence, and Breach of Warranty against AGCO. The Amended Complaint further asserted claims of Products Liability, Negligence, and Breach of Warranty against two newly named Defendants: M.M. Weaver & Sons, Inc. ("MM Weaver"), who had been a seller of the at-issue tractor, and Sporting Valley Turf Farms, Inc., Hummer Sports Surfaces, LLC, and Hummer Turfgrass Systems, Inc. (collectively "Turf Defendants"), who had previously owned the at-issue tractor. A central issue in the amended pleadings related to which Defendant, if any, was responsible for removing a safety guard from the at-issue tractor. After a second round of Preliminary Objections and other pleadings concerning, among other issues, proper jurisdiction and venue, the parties stipulated to dismiss Eastern Irrigation as a party to the suit. Following Court disposition of the motions, all remaining Defendants filed an Answer to the Amended Complaint and asserted cross claims against one another.[2]

---

[2] On May 3, 2016, Eastern Irrigation filed Preliminary Objections to Plaintiff's Amended Complaint, to which Plaintiff filed his opposition on May 24, 2016. A Rule was issued regarding the issue of venue/jurisdiction for June 29, 2016. On June 28, 2016, Eastern Irrigation filed a Praecipe to Withdraw its Preliminary Objections to Plaintiff's Amended Complaint.

On May 11, 2016, the Turf Defendants filed Preliminary Objections to Plaintiff's Amended Complaint, to which Plaintiff filed his opposition on June 2, 2016. On June 24, 2016, the Turf Defendants filed a Reply. On August 2, 2016, the Hon. John Younge docketed an Order overruling the Preliminary Objections. On May 24, 2016, AGCO filed Preliminary Objections to Plaintiff's Complaint; however, on June 13, 2016, AGCO filed a Praecipe to Withdraw its Preliminary Objections. On May 31, 2016, MM Weaver filed Preliminary Objections to Plaintiff's Complaint; however, on June 13, 2016, MM Weaver filed a Praecipe to Withdraw its Preliminary Objections. On June 23, 2016, the Turf Defendants filed a Petition to Transfer Venue. On June 27, 2016, AGCO filed a Motion to Join and Brief in Support of the Motion to Transfer Venue. On July 13, 2016, Plaintiff filed his opposition to the Motion to Transfer Venue. On August 30, 2016, the Hon. John Younge docketed an Order denying the Motion to Transfer Venue. On August 17, 2016, the Turf Defendants filed an Answer to Plaintiff's Amended Complaint with New Matter and Crossclaims against AGCO, MM Weaver, and Eastern Irrigation. On August 19, 2016, MM Weaver filed a Reply to Crossclaims. On September 14, 2016, Eastern Irrigation filed a Reply to Crossclaims. On December 15, 2016, Plaintiff filed a Reply to New Matter. On January 24, 2017, AGCO filed a Reply to Crossclaims. On October 6, 2016, MM Weaver filed an Answer to Plaintiff's Amended Complaint with New Matter and Crossclaims against AGCO, the Turf Defendants, and Eastern Irrigation. On October 11, 2016, Eastern Irrigation filed a Reply to Crossclaims. On November 8, 2016, the Turf Defendants filed a Reply to Crossclaims. On December 15, 2016, Plaintiff filed a Reply to New Matter. On January 24, 2017, AGCO filed a Reply to Crossclaims.

On October 17, 2016, Eastern Irrigation filed an Answer to Plaintiff's Amended Complaint with New Matter and Crossclaims against AGCO, MM Weaver, and the Turf Defendants. On October 19, 2016, MM Weaver filed a

Following the case management deadlines in this case, the Turf Defendants filed a Motion for Summary Judgment seeking dismissal of all claims asserted against them (Products Liability, Negligence, and Breach of Warranty).[3] On January 22, 2018, the Court[4] docketed an Order dismissing the claims of Products Liability and Breach of Warranty as to the Turf Defendants. Accordingly, the sole claim at trial as to the Turf Defendants was a Negligence claim. All claims of Negligence, Breach of Warranty, and Products Liability remained for trial as to AGCO and MM Weaver.

On or about May 30, 2018 this case was assigned to this Court for trial set to begin on June 1, 2018. Prior to the start of trial, the parties presented oral argument to this Court on approximately twenty written motions and other various pre-trial issues and this Court entered written Orders on or about June 4, 2018.[5] Many of the issues raised during motions *in limine* were

---

Reply to Crossclaims. On November 8, 2016, the Turf Defendants filed a Reply to Crossclaims. On January 18, 2017, Plaintiff filed a Reply to New Matter. On January 24, 2017, AGCO filed a Reply to Crossclaims.

On December 13, 2016, AGCO filed an Answer to Plaintiff's Amended Complaint with New Matter and Crossclaims against the Turf Defendants and Eastern Irrigation. On December 15, 2016, Eastern Irrigation filed a Reply to Crossclaims. On January 3, 2017, the Turf Defendants filed a Reply to Crossclaims. On January 20, 2017, Plaintiff filed a Reply to New Matter.

On July 13, 2017, Plaintiff, AGCO, MM Weaver, and the Turf Defendants entered a Stipulation that all claims and crossclaims against Eastern Irrigation were dismissed.

[3] Plaintiff filed his opposition on November 2, 2017 and the Turf Defendants filed a Reply in support of summary judgment on n November 15, 2017.

[4] The disposing judge was the Hon. Rosalyn Robinson.

[5] The inventory of all pre-trial motions is as follows:

1. **Control No. 18052143** – On May 16, 2018, the Turf Defendants filed a Motion in Limine to limit Plaintiff's claim for past medical expenses to the amounts actually paid, pursuant to *Moorhead*, which MM Weaver and AGCO joined, and to which Plaintiff filed his opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order granting the motion, by agreement.

2. **Control No. 18052305** – On May 17, 2018, Plaintiff filed a Motion in Limine to preclude evidence or testimony regarding Plaintiff's prior convictions and/or arrests, to which AGCO filed its opposition on May 29, 2018 and MM Weaver joined in the opposition. On June 4, 2018, this Court docketed an Order granting the motion in part, specifically stating that such evidence or testimony were precluded "unless such information is proven to be relevant to the testimony of the vocational experts."

3. **Control No. 18052307** – On May 17, 2018, Plaintiff filed a Motion in Limine to preclude certain evidence and testimony of MM Weaver's expert witness, Dr. Brian K. Bramel, to which MM Weaver filed its opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order denying the motion without prejudice to raise objections at trial.

4. **Control No. 18052308** – On May 17, 2018, Plaintiff filed a Motion in Limine to preclude any evidence, testimony or argument regarding parties that have been dismissed, to which AGCO filed its opposition on May 29,

2018 and MM Weaver joined in the opposition. On June 4, 2018, this Court docketed an Order denying the motion to the extent that the Defendants were arguing the Fair Share Act and without prejudice to raise objections at trial.

5. Control No. 18052312 – On May 17, 2018, Plaintiff filed a Motion in Limine to preclude MM Weaver from offering a liability defense at trial, to which AGCO and MM Weaver filed opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order denying the motion.

6. Control No. 18052317 – On May 17, 2018, Plaintiff filed a Motion in Limine to preclude evidence of Plaintiff's prior drug use, to which AGCO filed its opposition on May 29, 2018 and MM Weaver joined in the opposition. On June 4, 2018, this Court docketed an Order granting the motion in part, specifically precluding "any evidence, testimony, or argument regarding or referencing [Plaintiff]'s 2012 guilty plea for possession of a controlled substance and drug paraphernalia and/or the allegedly failed 2001 drug test, unless, at trial, such evidence is proven to be relevant to the testimony of the vocational experts or to life expectancy."

7. Control No. 18052320 – On May 17, 2018, Plaintiff filed a Motion in Limine to allow use of relevant and admissible excerpts of video depositions during opening statements, to which the Turf Defendants filed their opposition on May 29, 2018 and MM Weaver and AGCO joined in the opposition. On June 4, 2018, this Court docketed an Order denying the motion.

8. Control No. 18052375 – On May 17, 2018, the Turf Defendants filed a Motion in Limine to preclude use of videotaped testimony during opening statements, which MM Weaver and AGCO joined, and to which Plaintiff filed his opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order granting the motion.

9. Control No. 18052394 – On May 17, 2018, AGCO filed a Motion in Limine to preclude Dr. Robert Sing from offering testimony outside the scope of his expertise, which MM Weaver and the Turf Defendants joined, and to which Plaintiff filed his opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order reserving the motion for trial, but permitting Dr. Sing to testify as to those areas for which he had a reasonable pretention of knowledge or expertise and which were fairly within the context of his report.

10. Control No. 18052395 – On May 17, 2018, AGCO filed a Motion in Limine to limit Kevin B. Sevart, P.E. to the four corners of his report, which MM Weaver and the Turf Defendants joined. On June 4, 2018, this Court docketed an Order reserving the motion for trial.

11. Control No. 18052398 – On May 17, 2018, AGCO filed a Motion in Limine to preclude Dr. Guy Fried from offering testimony outside the scope of his expertise, which MM Weaver and the Turf Defendants joined, and to which Plaintiff filed his opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order reserving the motion for trial.

12. Control No. 18052471 – On May 17, 2018, AGCO filed a Motion in Limine to preclude cumulative medical expert testimony from Plaintiff, which MM Weaver and the Turf Defendants joined, and to which Plaintiff filed his opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order denying the motion without prejudice to raise objections at trial.

13. Control No. 18052521 – On May 17, 2018, the Turf Defendants filed a Motion in Limine to preclude Plaintiff from presenting any testimony or evidence of Plaintiff's workers' compensation decision, award, benefits, or lien, which AGCO and MM Weaver joined, and to which Plaintiff filed his opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order granting the motion in part, specifically stating that "workers' compensation issues shall not be directly presented to the jury; however, the Court will hear argument as to the amount of medical expenses when discussing the charge to the jury at the June 19, 2018 charging conference."

14. Control No. 18052557 – On May 17, 2018, the Turf Defendants filed a Motion in Limine to preclude the testimony of Kevin B. Sevart, P.E., which MM Weaver joined, and to which Plaintiff filed his opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order denying the motion without prejudice to raise objections at trial.

15. Control No. 18052563 – On May 17, 2018, the Turf Defendants filed a Motion in Limine to preclude the testimony of Charles Miller, to which Plaintiff filed his opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order denying the motion without prejudice to raise objections at trial.

16. Control No. 18052564 – On May 17, 2018, the Turf Defendants filed a Motion in Limine to preclude the introduction of any evidence of liability, to which Plaintiff filed his opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order denying the motion without prejudice to raise objections, motions for non-suit, and/or motions for directed verdict at trial.

17. Control No. 18052664 – On May 18, 2018, AGCO filed a Motion in Limine to preclude Kevin Sevart, P.E. from offering failure to warn testimony, which MM Weaver joined, and to which Plaintiff filed his opposition on May 29, 2018. On June 4, 2018, this Court docketed an Order denying the motion without prejudice to raise objections

deferred for trial and, therefore, during trial, these issues, among other evidentiary issues, were exhaustively litigated over many hours of argument. Several of these issues are again presented in Plaintiff's post-trial motion and thus, will be discussed in more detail later in this Opinion.

### ii. Trial

Jury selection spanned two days, concluding on June 4, 2018, and Plaintiff presented his case in chief from June 5, 2018 to June 12, 2019. On June 12, 2018, after Plaintiff rested his case in chief, the Turf Defendants filed a written Motion for Directed Verdict or Compulsory Nonsuit.[6] On June 12, 2018, MM Weaver, and AGCO each joined in the motion and this Court heard argument on the motion, wherein each Defendant made their individual requests for nonsuit. Following argument, this Court denied all requests for nonsuit in consideration of the coordinate denial of summary judgment by the Hon. Rosalyn Robinson based upon the same legal argument; however, in denying the requests for nonsuit, this Court reserved continued argument for motions for directed verdict at the close of all evidence, thereby leaving the issue open.[7]

---

at trial and specifically stating that the witness may testify as to that information which is fairly within the context of his report.

    18. **Control No. 18053809** – On May 29, 2018, Plaintiff filed a Motion in Limine to preclude any evidence, argument, or testimony, that Plaintiff's employer, George E. Ley, Co., was negligent, to which the Turf Defendants filed their opposition on June 4, 2018. On June 4, 2018, this Court docketed an Order denying the motion to the extent that the defenses at issue were relevant to factual cause and without prejudice to raise objections at trial.

    19. **Control No. 18053810** – On May 29, 2018, Plaintiff filed a Motion in Limine to preclude evidence of governmental regulations or industry standards, to which AGCO filed its opposition on June 4, 2018.

    20. **Control No. 18053811** – On May 29, 2018, Plaintiff filed a Motion in Limine to instruct the jury to infer that the testimony of Mr. George Ley, Mr. Jeff Immell, and Mr. Jeff Martin would be adverse to AGCO if they did not appear. On June 4, 2018, this Court docketed an Order reserving the motion for trial.

    Further, on June 13, 2018, the Turf Defendants filed a Motion in Limine (Control No. 18061580) to limit the testimony of Charles Miller and, on June 14, 2018, Plaintiff submitted a bench brief in support of the cross-examination of AGCO's expert witness, David Murray, concerning the report of John Huffman and Mark Ezra, which Mr. Murray reviewed and considered prior to offering his opinions to the Court

[6] The motion was filed at Control No. 18061430. Plaintiff filed his opposition on June 15, 2018 and the Turf Defendants filed a Surreply on June 15, 2018

[7] *See* N.T. 6/12/2018 at 39-58 (providing argument of Turf Defendants); 58-66 (providing argument of MM Weaver); 66-78 (providing argument of (AGCO).

On June 15, 2018, amidst the discussion with the parties regarding the moving in of exhibits, this Court referenced the upcoming arguments regarding the directed verdict which the Court had left open from June 12, 2018. Later in the day, following the close of evidence on June 15, 2018, the Turf Defendants, MM Weaver, and AGGO each presented their separate requests for directed verdict.[8] On June 15, 2018, this Court addressed the arguments of each Defendant and declined to make any immediate grant of a directed verdict that afternoon, but reiterated that the issue was still pending as it related to how the jury would be charged and the verdict slip crafted, as would be discussed at the charging conference on the following Monday (June 18, 2018).

On June 18, 2019, this Court conducted a full day charging conference to parse out the various claims and theories of liability against each Defendant, to draft the appropriate charges for the jury pertaining to such claims, and to create a clear and comprehensive verdict slip. Additionally, the multiple defense requests for directed verdict were still pending before this Court. After five hours of unresolved dispute over the claims, theories, charge, and verdict slip, this Court directed Plaintiff to identify the theories of negligence against each Defendant. Utilizing the hours of discussion and prior argument on the issue throughout trial, this Court determined that Plaintiff had not established its claim of negligence against AGCO and directed verdict on that claim only. The transcript from June 18, 2018 reflects the following:

> **THE COURT:** What's your negligence theory against each of the defendants?
> **MR. GOODMAN:** Negligence theory against defendant, AGCO, is that it was negligent for not utilizing all available safety technology to prevent the tractor from moving -- I'm reading from what I had submitted -- to prevent the tractor from moving during a bypass start, and failing to adequately monitor history of bypass start accidents.
> **THE COURT:** Where does the duty come from?
> **MR. GOODMAN:** From the duty on a product manufacturer to take reasonable steps to make sure their product is safe, which incorporates the duty to monitor what's going on with it.

---

[8] *See* N.T. 6/15/2018 at 84-108 (providing argument of Turf Defendants); 109-114 (providing argument of MM Weaver); 114-125 (providing argument of AGCO).

8

MR. LEHMAN: There's been no expert testimony whatsoever about any negligence duty as to AGCO. The only expert testimony against AGCO is the product is defective and it doesn't have OPS. That's what Mr. Sivart sat up there and said.

MR. MURTAGH: Page 77, Mr. Sivart's testimony.

THE COURT: You need an expert.

MR. GOODMAN: There was testimony on the cross-examination of Mr. Murray and Mr. Ney concerning the responsibilities of the manufacturer, make sure their products are reasonably safe. There was the --

THE COURT: That's the obligation that the law puts on them.

MR. GOODMAN: Yes, there's an obligation the law puts on them. Duty is an issue of --

THE COURT: You have to have an expert that comes forward and says, you have a duty to do this, you have a duty to, you know, measure it this way, and place it that way and, you know, do this research and that research. I didn't hear any of that.

MR. GOODMAN: Duty is an issue, A, for the Court of law. B, Mr. Murray admitted --

THE COURT: Are you asking for a directed verdict?

MR. MURTAGH: On this issue? Yes, Your Honor.

THE COURT: It is granted.[9]

Plaintiff disingenuously avers in the instant motion that this Court's decision was made *sua sponte*; however, the extensive record proceedings and the ongoing determinations of the requests for nonsuit and/or directed verdict over the course of the trial belie this assertion.

Even though this Court instructed the parties on June 15, 2018 that the charging conference would be on June 18, 2018, Plaintiff submitted a "bench brief" on June 19, 2018, after this Court had already held the charging conference and rejected Plaintiff's negligence claims against AGCO. This Court treated the June 19, 2018 filing as an apparent attempt to request reconsideration of this Court's ruling from June 18, 2018. This Court did not reconsider its ruling, but clarified that the ruling on June 18, 2018 was based upon Plaintiff's failure to meet his burden of proof and not on a per se rule precluding the submission of both a negligence and strict products liability to the jury. On June 19, 2018, following the closing arguments of counsel, this Court charged the jury. On

---

[9] N.T. 6/18/2018 p.m. session at 30-32.

9

June 20, 2018, the jury returned a verdict in favor of all Defendants and against the Plaintiff on all claims.

### iii. Post-Trial

On July 2, 2018, Plaintiff filed the instant Post-Trial Motion for a New Trial and, on July 6, 2018, this Court issued a briefing schedule and scheduled oral argument for September 17, 2018. On July 18, 2018, AGCO filed a Motion for Extraordinary Relief to extend the oral argument date, which this Court granted and rescheduled oral argument for October 1, 2018. On September 27, 2018, AGCO filed a second Motion for Extraordinary Relief to extend the oral argument date, which this Court granted and rescheduled oral argument for November 7, 2018. Following oral argument, the parties filed supplemental briefs and further stipulated to a waiver of the 120 day disposition requirement for post-verdict motions under Pa.R.C.P 227.4(1)(b). During the pendency of this post-trial motion, Plaintiff has settled his claims against MM Weaver and the Turf Defendants; however, AGCO remains a party to the litigation.

### DISCUSSION

It is well settled that the grant of a new trial is a matter within the sound discretion of the trial court.[10] As long held by our Supreme Court, "[t]he grant of a new trial is an effective instrumentality for seeking and achieving justice in those instances where the original trial, because of taint, unfairness or error, produces something other than a just and fair result, which, after all, is the primary goal of all legal proceedings."[11] In evaluating a request for a new trial, the trial court shall employ a two-part analysis: first, the court must determine if any mistakes –

---

[10] *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998).
[11] *Dornon v. McCarthy*, 195 A.2d 520, 522 (Pa. 1963).

whether they be factual, legal, or discretionary – occurred at trial; and second, if it is determined that any mistake(s) occurred, the court must assess whether such mistake provides a sufficient basis for granting a new trial.[12] The trial court's determination of whether a sufficient basis exists is governed by the harmless error doctrine.[13] In explaining such standard, our Supreme Court has opined that "[a] new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake."[14]

Additionally, while this Court acknowledges the Turf Defendants' arguments regarding the posture of Plaintiff's instant motion – classifying it as a request for modification pursuant to title 42 Pa.C.S §5505 rather than a post-trial motion pursuant to by Pa.R.C.P. 227.1 – this Court has decided, in the interests of judicial economy, to address the substantive issues as raised in a post-trial motion governed by Pa.R.C.P. 227.1

### 1. The trial court properly directed verdict on Plaintiff's negligence claim against Defendant AGCO

Plaintiff's first claim of error is that this Court improperly dismissed Plaintiff's claim of negligence against Defendant AGCO. Plaintiff's assertions of error are twofold: first, that this Court made an error in directing verdict *sua sponte*; and second, that this Court made an error of law in determining that Plaintiff had not set forth the requisite elements of a negligence claim against AGCO. This Court disagrees. Additionally, while this Court acknowledges and appreciates AGCO's arguments regarding the timeliness of Plaintiff's instant claim of error, this

---

[12] *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1122 (Pa. 2000).

[13] *Harman ex rel. Harman*, 756 A.2d at 1122.

[14] *Harman ex rel. Harman*, 756 A.2d at 1122.

11

Court has decided to address Plaintiff's unfounded and disingenuous claims of a "sua sponte" directed verdict and the Court will defer discussion on the issue of waiver for a 1925(a) Opinion.

The extensive record proceedings summarized in the procedural history above highlight that there were numerous requests for nonsuit and/or directed verdict, in written and oral form over the course of this litigation. During trial, this Court heard argument from each of the Defendants regarding nonsuit at the close of Plaintiff's evidence on June 12, 2018. While all requests for nonsuit were denied, partially because of a previous ruling from another judge, this Court acknowledged that the argument would be continued at the close of all evidence, thereby leaving the issue open.[15] On June 15, 2018, each of the Defendants again presented their separate requests for directed verdict.[16] In addressing the various arguments, this Court repeatedly indicated that the final determination for all requests for directed verdict would be born out at the charging conference, where Plaintiff would ultimately have to indicate the claims being moved on with the related charges and interrogatories for the jury. Specifically, over the course of the arguments on June 15, 2018, this Court stated:

> **THE COURT:** Then you've got to really look how you're asking me to charge, because there is plenty of -- our jurisdiction hasn't thought about this, but 25 years ago, when they said you can't put a negligence and a strict product liability claim in, because by the way you charge, you can get an inconsistent verdict. And so you better make sure, I'm not giving anything over, but I will not charge so that there's an inconsistent verdict. And we'll just look at it -- it may be that that means I'm granting your directed verdict on one or both. I'm not saying you're not going to ask me for both, and just need to parse out exactly what the elements of each claim are. And that's why it's going to take us all day on Monday. But I am not -- I am not -- you can -- I'm not telling you now, you just -- we'll work through it all. I understand that you'll ask for products liability, and then there will be an allocation, but that's when you have to pull out the book, pull out the books, the case law, and run through what the elements would be as to each party, and then what's the evidence as to each party to see, really, are you making a strict liability

---

[15] *See* N.T. 6/12/2018 at 39-58 (providing argument of Turf Defendants); 58-66 (providing argument of MM Weaver); 66-78 (providing argument of (AGCO).
[16] *See* N.T. 6/15/2018 at 84-108 (providing argument of Turf Defendants); 109-114 (providing argument of MM Weaver); 114-125 (providing argument of AGCO).

claim, as we call it, 402A claim or a negligence claim. Okay. Because a negligence product liability claim is much harder to prove than a 402A products liability claim. So it's just, you know, I'm just saying that that's why we'll separate them. I've just, to the jury, always say products liability, because it doesn't really matter in the end.

MR. DEMARCO: So we're clear, I would request a directed verdict on that products claim.

THE COURT: Understood.

MR. DEMARCO: Based on modifications.

THE COURT: I'm not granting that. I'm just saying something is going to the jury. I just don't know exactly how the jury will get charged.[17]

[. . .]

THE COURT: I'm not directing a verdict at this point, but I want it to be understood that that does not necessarily mean that I will charge on everything. It may be that your -- I don't know until we actually get down to the details of what the elements of the claim are.[18]

[. . .]

THE COURT: I've been able to avoid the issue until now, but I think this is one that I cannot. I will have to make a ruling. I'm telling you that I don't know where the Supreme Court is going on it. I don't. Maybe if you guys have some – I will even look at unpublished cases, even though I know they're not precedential, just to get a sense for what's happening from the Superior Court. I know they're doing things and I know they're doing things in an unpublished way. So if you guys have cases where they're unpublished, but give us guidance, I will look at them. Okay. So I'm denying your directed verdict. Mr. Murtagh I understand you're making a directed verdict under the line of cases. That would be the Davis versus [Berwind] and what's included in those.[19]

[. . .]

THE COURT: Get ready to get your jury instructions together, yes. You can interpret it in that way. But I don't want -- for our record, when -- I mean, directed verdict, I'm treating this as, yeah, I get to go home and I'm not on the verdict slip, directed verdict. It's not taking away that in some ways directed verdict also is how the judge charges. So that's a different issue. I just want you to understand that. When I say we'll see you at jury instructions, don't say, oh, well you said you were denying that directed verdict. I'm not necessarily ruling on your issues of partial directed verdict.[20]

As such, on Friday June 15, 2018, when the trial broke for the weekend, it was clear to all of the parties that the issue of how the jury would be charged vis-à-vis both negligence and strict products

---

[17] N.T. 6/15/2018 at 112-114.
[18] N.T. 6/15/2018 at 115-116.
[19] N.T. 6/15/2018 at 121-122
[20] N.T. 6/15/2018 at 125.

liability *was still pending* and would be resolved at the charging conference scheduled for the following Monday, June 18, 2018.

At the full-day charging conference on June 18, 2018, the parties continued their arguments regarding the claims of negligence and strict liability against each Defendant and the appropriate charges and interrogatories for the jury pertaining to such claims. After five hours of unresolved dispute, this Court directed Plaintiff to identify the theories of negligence against each Defendant in order to try to create the most clear and comprehensive charge and related interrogatories. Utilizing the hours of discussion and prior argument on the issue throughout trial, this Court determined that Plaintiff had not established his claim of negligence against AGCO and directed verdict on that claim only.[21] Plaintiff's instant claim of error grossly mischaracterizes the posture of the partial directed verdict granted by this Court, as it wholly ignores the extensive on-record argument regarding the requests for nonsuit and the requests for directed verdict that this Court heard and on which this Court continued to defer final determination. As such, this Court finds the instant claim without merit and has determined that no error occurred.

In addition to challenging the posture of the directed verdict, Plaintiff also asserts that this Court made an error of law in determining that Plaintiff had not set forth the requisite elements of a negligence claim against AGCO. This Court disagrees. Initially, this Court acknowledges AGCO's continuing argument that, in the wake of *Tincher v. Omega Flex*[22], Plaintiff may not simultaneously present the jury with both a negligent design theory and a strict liability theory under Restatement (Second) of Torts § 402A. AGCO avers that the rationale in *Phillips v. Cricket Lighters*[23] – on which Plaintiff relies – no longer supports the simultaneous submission of a

---

[21] N.T. 6/18/2018 p.m. session at 30-32, as included in the Procedural History at p8-9.
[22] 104 A.3d 328 (Pa. 2014).
[23] 841 A.2d 1000 (Pa. 2003).

14

negligent design theory and a 402A theory to the jury because the *Phillips* rationale was rooted in the existing precedent of *Azzarello v. Black Brothers Company*[24] wherein the court maintained a strict divide between negligence and strict liability concepts. In *Tincher*, the Supreme Court expressly overruled *Azzarello* and, as such, AGCO asserts that the simultaneous submission of a negligent design theory and a 402A theory is no longer cognizable under the precedent of this Commonwealth, based upon the *Tincher* Court's recognition that "in design cases, the character of the product and the conduct of the manufacturer are largely inseparable."[25] This Court, in rendering the at-issue directed verdict, **made no determination that the post-*Tincher* landscape precluded the simultaneous submission of a negligent design theory and a 402A theory to the jury,** but instead determined that Plaintiff had not met his burden to send the negligent design theory to the jury.

To establish a claim of negligence, "the plaintiff must show [by a preponderance of the evidence] that the defendant had a duty 'to conform to a certain standard of conduct;' that the defendant breached that duty; that such breach caused the injury in question; and actual loss or damage."[26] Simply stated, negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances.[27] While the basic tenets of a common law negligence claim – duty, breach, causation, and damages – are mirrored in the structural underpinnings of a strict liability claim under Section 402A, our jurisprudence is clear that Plaintiff bears the burden of establishing two separate and distinct claims. Pursuant to Section 402A,

---

[24] 391 A.2d 1020 (Pa. 1978).

[25] *Tincher*, 104 A.3d at 405.

[26] *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003) (citing *Morena v. South Hills Health System*, 462 A.2d 680, 684 n. 5 (Pa. 1983)).

[27] *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998). *See also* Pa. SSJI (Civ) 3.01.

15

[a] person or entity engaged in the business of selling a product has a duty to make and/or market the product – which "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold" – free from a "defective condition unreasonably dangerous to the consumer or [the consumer's] property."[28]

However, as stated by our Supreme Court in *Tincher*, "**the duty spoken of in strict liability is intended to be distinct from the duty of due care in negligence.**"[29] The Court further explained that while a strict liability action sounds in tort, "the tortious conduct at issue is not the same as that found in traditional claims of negligence and commonly associated with the more colloquial notion of 'fault.'"[30] Accordingly, a Plaintiff seeking to present both a common law negligence claim and a claim for strict products liability under Section 402A for the same alleged design flaw(s) bears the burden of establishing the common law duty and breach separate and apart from those established pursuant to Section 402A.

In making the determination that Plaintiff failed to establish the necessary elements of a negligent design claim, this Court examined the testimony of Plaintiff's witness Kevin Sevart, P.E., who was presented as an expert in tractor design and safety in occupant presence controls. In relevant portion, Mr. Sevart's testimony on direct examination provided the following:

[BY MR. GOODMAN:]
Q. In this case, we've heard a lot about the starter shield or guard over the solanoid starter. First of all, was there any guard present when you conducted your evaluation?
A. No.
Q. Are guards the industry standard that they are to be on the equipment as it is designed and sold by the manufacturer?
A. There is an industry standard that requires a shield over the starter solanoid and also kind of a -- a divider between these terminals that I was describing.
Q. If a guard needs to be on over the solanoid, how do these accidents keep happening?
A. Because there's still people having trouble getting their tractors to start with the key switch. In all the accidents I've investigated, there was always problems with

---

[28] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 383 (Pa. 2014) (citing RESTATEMENT (2D) OF TORTS §402A(1))
[29] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 383 (Pa. 2014) (emphasis added).
[30] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 400 (Pa. 2014).

the starting circuitry, but the tractor needed to be used that day. That's why the bypass start occurred. It's been recognized even in the standard. The only purpose of the shield is to discourage bypass starting. It's not to eliminate or prevent it. It's a deterrent, but it's not, you know, the shield can be removed, as it was, apparently, in this case, it wasn't. I know that. The tractor won't start, so a bypass start is done.[31]

[. . .]

[BY MR. GOODMAN:]
Q. Is the removal of the guard something that is foreseeable to the industry?
MR. MURTAGH: Objection.
THE COURT: Overruled.
THE WITNESS: Yes, to any engineer that studied these accidents, it's foreseeable that that guard is going to be removed. Particularly that whole bypass starter came about because people were having trouble getting tractors to start and that underlying problem hasn't been addressed. The tractor is still hard to start. So these issues arise, so it's necessary to bypass start if you're going to work that day.[32]

[. . .]

[BY MR. GOODMAN:]
Q. Mr. Sivart, in connection with this case, were you asked to render your opinion on whether this tractor, by lacking OPC, is considered defective and not compliant with -- is considered defective?
A. Yes.
Q. And what is that opinion?
A. That this tractor is defective in design, because it lacks the necessary mechanism to neutralize the machine when there's no operator present, or an OPC.
Q. The technology that you suggested, the OPC, was it completely both technically and economically feasible in 2005 to have installed this?
A. Yes.
Q. Mr. Sivart, have all the opinions that you've given today been to a reasonable degree of professional engineering certainty?
A. Yes, they are.[33]

Mr. Sevart's testimony on cross-examination by AGCO, in relevant portion, further provided

that:

[BY MR. MURTAUGH:]
Q. So my point is, as of the time you wrote your paper in 2011, Section 318, the safety for agricultural field equipment, that did not include a requirement that there be an operator presence system on agricultural utility tractors; correct?
A. That's correct.

---

[31] N.T. 6/11/2018 p.m. session at 55-56.
[32] N.T. 6/11/2018 p.m. session at 58:2-17.
[33] N.T. 6/11/2018 p.m. session at 77-78.

Q. You, in the end of your paper, the last sentence in your paper is: Provisions should be provided in ASAE 318 to require an operator presence control on agricultural tractors. That was your opinion; right?

A. Yes.

Q. So our tractor here was built in 2005; right?

A. Yes.

Q. This is six years after that. There isn't any requirement for 318 to have an OPS on an agricultural utility tractor; correct?

A. Correct.

Q. And even today, there is no requirement, there is no standard to suggest that there should be an OPS that shuts off the engine or detaches the drive train from it?

A. No. There's written standard of care that suggests that that would be the code of ethics for engineers, but as far as the specific machinery standard like 318, your statement would be correct.

Q. Am I correct, even today, as I said, there is no standard for use of agricultural tractors that says you have to have an OPS that shuts off the engine or the attachment to the drive train. We're together now; right?

A. If you put that in quotes, that statement, that would be correct. I'm saying that the written standard of expected care would imply that, based on all these accidents we just went over.

Q. What you're trying to say to the jury, there's a code of ethics for engineers that doesn't say anything about 318 or agricultural tractors. Simply said, you had to make things safe essentially; right?

A. That's the engineer's paramount responsibility, is the safety of the public that's exposed to the machine.

Q. But you don't have any problem with my question, which is about the standard that actually applies to what is required on an agricultural utility tractor; correct?

A. Correct. I agree that that's not in that standard. That's why I'm still pressing this agency to incorporate that.[34]

The entire body of Mr. Sevart's testimony concerning the guard and the OPC feature was directed toward establishing Plaintiff's products liability claim under Section 402A In Plaintiff's final four questions to the witness in which he sought Mr. Sevart's expert opinion, he elicited the testimony that the tractor was defective "because it lacks the necessary mechanism to neutralize the machine when there's no operator present, or an OPC." This testimony goes to the heart of Plaintiff's products liability claim, but does not simultaneously establish the requisite elements of a negligence claim, as Plaintiff failed to set forth how AGCO, an agricultural tractor

---

[34] N.T. 6/11/2018 p.m. session at 89-92.

manufacturer, failed to conform to a certain standard of conduct. Indeed, on cross examination, Plaintiff's expert conceded that no "duty" existed under a negligence theory.

The failure of Plaintiff to marshal sufficient evidence to support a negligence claim against AGCO is made clear by the record given that the phrase "standard of care" is entirely *absent* from Mr. Sevart's testimony on direct examination. Moreover, on cross-examination by AGCO, Mr. Sevart conceded that AGCO had not breached any technical, manufacturing or industry standards. Mr. Sevart's reference to an engineer's general responsibility to make a machine "safe" does not satisfy the Plaintiff's burden of proof under a negligence theory. In rejecting Plaintiff's argument at trial that he had established the necessary elements of breach and duty for a negligence claim, this Court stated:

> You have to have an expert that testifies as to duty. And just parroting back to me the law is not establishing duty. This is not just -- it's a manufacturer. It's an agricultural industrial equipment. And your expert has to set forth the standard of care and they didn't. I sat through this testimony. The case went in as a 402A products liability claim against AGCO for that purpose on that issue.
> There was no other testimony from Mr. S[e]vart. All your individual people cannot set forth the standard of care for the manufacturer. Maybe for MM Weaver, and maybe for Mr. Fowler's clients. But not for AGCO. The only person who could set forth duty is your expert. And all I heard your expert talk about was the issues about the seat. And never used the words they were negligent because they didn't put this on. Not once. Not once did he ever use that word.
> He never said what the standard of care was. And that's why the Court is granting negligence against AGCO, because quite frankly, it came as quite a surprise to the Court that you were even moving on a negligence claim against AGCO because that's just not the way the case was tried.[35]

This Court further clarified that the directed verdict on Plaintiff's negligent design claim was independent of Plaintiff proceeding on his products liability claim under Section 402A and emphasized that the duty required in a negligence action is distinct from that of a products liability claim and must be separately established. Specifically, this Court stated:

---

[35] N.T. 6/18/2018 p.m. at 33-34.

The only way you can possibly do that is there are two very distinct legal theories like they violated an ANSI standard or government regulations. Then it's the duty. But you cannot just use the same expert to show design defect and say it covers it all. Negligence is a separate claim under the law and you have to say what the duty is and it has to be set forth somewhere. I'm not saying that you can't go forward on either one, but they are separate claims and your expert has to have a separate theory and right now I'm hearing the same expert opinion, same exact words can be used under either theory. I don't think that's the law[.][36]

Plaintiff attempts to cure the defects in his expert's testimony by pointing to the testimony from AGCO's witnesses as establishing the required standard of care in the case. Assuming *arguendo* that Plaintiff could properly rely on his opponent's experts to establish the element of duty, his negligence claim still could not be submitted to the jury because there remained no evidence that AGCO violated or breached the standard of care owed. Indeed, Plaintiff's expert on cross-examination conceded that AGCO had not breached any specific standard of care in place at the time the tractor at issue was manufactured.[37]

## 2. The trial court properly limited the cross-examination of Defendant AGCO's expert witness

Plaintiff next asserts that it was improper for this Court to preclude Plaintiff from cross-examining AGCO's expert witness David L. Murray, and similarly AGCO's expert witness Kirk Ney, with the hearsay opinions contained within the expert reports of co-defendant MM Weaver's expert (supporting of MM Weaver's cross claim against AGCO), *where such experts were not called at trial* and MM Weaver did not pursue its cross claim against AGCO.[38]

This Court first addressed the reports of MM Weaver's experts, Mark Ezra, P.E. and John F. Huffman, P.E. ("Ezra and Huffman"), prior to trial in the disposition of Plaintiff's Motion in

---

[36] N.T. 6/18/2018 a.m. at 35-36.
[37] N.T. 6/11/2018 p.m. session at 89-92.
[38] 's experts, Mark Ezra, P.E. and John F. Huffman, P.E. PMP. ("Ezra & Huffman"), *who were MM Weaver's retained*

Limine at Control No. 18052312. In said Motion, Plaintiff sought to preclude MM Weaver from offering a liability defense at trial based upon the allegation that MM Weaver "concedes in its [e]xpert [r]eport of [Ezra & Huffman] that the subject [t]ractor was dangerously defective and that the defect was causative of [Plaintiff]'s severe injuries."[39] On June 4, 2018, this Court docketed an Order denying the Motion based on the tenet that MM Weaver retained the ability to determine its defense at trial and to determine whether it would proceed on its cross-claim against AGCO. Whether MM Weaver would or would not use certain legal theories at trial were properly reserved for trial.[40]

At trial, MM Weaver elected not to pursue its cross-claims against AGCO and consequently AGCO did not present experts Ezra and Huffman. AGCO presented David L. Murray as an expert in tractor and agricultural design and safety.[41] In its direct examination of Mr. Murray, AGCO made no mention of the reports of Ezra and Huffman. However, on cross-examination, Plaintiff repeatedly attempted to introduce the opinions of Ezra and Huffman. This Court sustained all objections to this line of questioning as an improper attempt to circumvent this Court's pre-trial rulings and as an overly prejudicial introduction of hearsay. Further, the controlling caselaw of this Commonwealth prevents a party from introducing the opinions contained within the reports of an opponent's *non-testifying witnesses*. For ease on review, the full transcript of the questioning and objections provides:

[BY MR. GOODMAN:]
Q. Now, for example, when Mr. Sevart rendered his, gave his report, he got that, you reviewed it, right?
A. That's correct.

[39] Motion in Limine of Plaintiff at Control No. 18052312 at No. 18.
[40] *See also Wilkerson v. Allied Van Lines*, 521 A.2d 25 (Pa. Super. 1987) (concluding expert report provided in response to interrogatory requesting such report was not admission).
[41] Although unrelated to the instant issue concerning the Ezra and Huffman report and Mr. Murray's testimony as an expert, this Court notes that Mr. Murray also provided testimony as a fact witness concerning his direct involvement in the instant matter.

Q. You told us earlier you considered it, right?

A. That's correct.

Q. And if there was something in there that you looked at and you said, you know, he makes a pretty good point here, am I correct that as the safety director, as the safety engineer for AGCO, you would at least follow up, be it test it or pass it along or discuss it, right, if that happened? I'm not suggesting you did. I realize you disagree with his findings.

A. As a hypothetical, yes.

Q. You understand as an engineer, safety of your products comes first, right?

A. Safety is important. Reduces risks on our products to acceptable level for intended uses is very important for us, yes.

Q. My question is: As an engineer, the safety of your products comes first? Is that a yes?

A. It's -- yes.

Q. As part we mentioned that you had reviewed Mr. Sevart's report and you mentioned a couple of times during your examination the testimony of Mr. Miller, Charlie Miller from Mississippi, who came in and explained some stuff to us. Did you review Mr. Miller's reports, as well?

A. Yes.

Q. Did you review the reports that were provided on behalf of other defendants in this case?

A. Yes.

Q. Did you review the report provided by Mr. Ney on behalf of AGCO?

A. Yes.

Q. You mentioned that you reviewed the other liability-related reports in this case. Did you review the -- when I say review, everything you reviewed you considered, right?

A. Yes.

Q. Did you review the report from Mr. Huffman and Mr. Ezra submitted on behalf of M.M. Weaver?

MR. DEMARCO: Objection.

THE COURT: Sustained.

MR. GOODMAN: May we be heard on this issue.

THE COURT: Didn't I already issue a ruling on it?

MR. GOODMAN: There has not been a ruling.

THE COURT: If it's something I changed my mind on, you can cover it in recross.

BY MR. GOODMAN:

Q. Did you review any reports, other than Mr. Sevart, which discuss -- I'm not going to get intowhat they say -- which discuss occupant presence controls?

MR. DEMARCO: Same objection. Simply a different way of phrasing something.

THE COURT: No. Did he review any other reports; yes or no?

BY MR. GOODMAN:

Q. Regarding OPC.

A. I saw the report.

Q. As an engineer, am I correct as a safety director, that if someone comes forth, other than Mr. Sevart, and said OPC was necessary technology that rendered your product defective, that is something you would consider, right?

A. I would consider that on its merits.

Q. What do you mean you would consider it on its merits?

A. Well, on the merits of the report on what it was based on.

Q. Sir, would you consider what your dealer had to say about whether they thought OPC was necessary technology and the lack of it rendered your product defective, would you consider what your dealer had to say about that?

MR. DEMARCO: Same objection.

MR. MURTAGH: Objection.

MR. DEMARCO: First of all, the dealer hasn't said anything about OPC.

THE COURT: I made pretrial rulings on what could or could not be admissible. We are not going to go over that again. If that's violated, then everyone knows what will happen. The objection is sustained.

MR. GOODMAN: There was no --

THE COURT: Sustained. Why don't you guys talk so that -- Mr. DeMarco tell Mr. Goodman why you're making the objection so he will understand so maybe he can rephrase the question and then take away the objection. Make sure he understands.

MR. DEMARCO: I'm pretty sure Mr. Goodman understands.

MR. GOODMAN: There was no pretrial ruling at all.

THE COURT: Yes, there was. There was.

BY MR. GOODMAN:

Q. Sir, is the report of Mr. Huffman and Mr. Ezra something that you considered and relied upon in this case?

THE COURT: Sustained. I don't think that either one of those people are testifying. Am I right?

MR. DEMARCO: They're not.

MR. GOODMAN: Every expert has been permitted to discuss what they reviewed.

THE COURT: No, Mr. Goodman. The rules on this are very clear. And those people, they're not -- just explain to my jury. Remember I told you when people don't come in and they're not going to be here and we already have been told they are not coming, it's not that anybody is hiding information from you. But people can't get in information through a witness that they couldn't get it in any other way. Kind of like I didn't let Mr. Murtagh have him testify to things. You can't bring in certain things. And I'm just explaining to my jury they are not coming in and you're not going to hear about them and you're not going to hear about them through anybody else either. Because those are the rules. You can move along from that.[42]

[. . .]

[42] N.T. 6/13/2018 p.m. at 67-72.

23

**BY MR. GOODMAN:**
Q. In your industry, am I correct that Mr. Sevart is not the only one that has been advocating for OPCs for decades?
A. I don't have a name to give you. I assume that's correct, yes.
Q. You don't have a name to give me. Do you have two names?
A. Excuse me?
MR. MURTAGH: Objection.
THE COURT: Does he know any names, is that what you're asking?
MR. GOODMAN: He said a name. I'm wondering if there is two.
THE COURT: Or three or five. Is there a significance about the number?
THE WITNESS: So I do remember a report by Mr. Sevart or his father and one of] their colleagues, if I remember right, if that's correct.
**BY MR. GOODMAN:**
Q. And you know there has been reports from people other than Mr. Sevart and his colleagues, right, discussing OPC --
THE COURT: Here's what I will say, I made pretrial rulings in this matter. I think Mr. Goodman keeps trying to get something to come in –
MR. GOODMAN: There was no ruling --
MR. MURTAGH: I'm saying objection –
THE COURT: Let me give my jury a break so I can possibly reprimand Mr. Goodman.[43]

Following the testimony of Mr. Murray, AGCO presented Kirk Ney as an expert in accident reconstruction and investigation. Akin to the cross-examination of Mr. Murray, Plaintiff properly questioned Mr. Ney as to whether he had been provided with the reports of other testifying witnesses; however, Plaintiff's questioning again overstepped the rulings of this Court as well as the controlling caselaw of this Commonwealth when Mr. Ney was asked about "any other reports" pertaining to the issue of liability, which implicated the opinions of co-defendant's *non-testifying witnesses*. The relevant portion of the transcript provides:

**[BY MR. GOODMAN:]**
Q. Mr. Sevart and his father are not the only people that have advocated for occupant presence] controls over the years, are they?
A. The only ones or his office that I know of. I haven't heard of anybody else.
Q. Are you aware, sir, of anyone else who has specifically for the Massey Ferguson 451 said that that product needs an occupant presence control and without it it's defective?
A. Other than Kevin Sevart?
Q. Yes.

---

[43] N.T. 6/13/2018 p.m. at 73-74.

A. No.

**MR. GOODMAN:** May we approach, Your Honor?

**THE COURT:** No. You cannot.

**BY MR. GOODMAN:**

Q. Sir, you described for us the material that you reviewed in connection with this case. Was all the material that you reviewed supplied to you by counsel for AGCO?

A. Yes.

Q. Maybe you didn't research it, the standards on your own beyond that or your own knowledge, I'm guessing?

A. I have standards, also, and certainly knowledge of the industry and what have you. But the actual documents like depositions were provided by Mr. Murtagh.

Q. Mr. Murtagh provided you with the expert reports from the plaintiff for Mr. Sevart and from Mr. Miller, right?

A. Yes.

Q. Did he provide you with any other reports as they pertained to liability in this case?

A. May I look at my –

**THE COURT:** The objection is sustained. Whoever testifies in this case is who the jury is to and whether there was other reports produced or not produced is not relevant for this jury. Do you understand? Doesn't matter whether -- because you heard this case has been going on -- what year did it get filed? You guys heard there were two years of things that they passed back and forth and reports and discovery and documents. I bet you if I looked in those files -- how many boxes did everybody bring over here? We are not going to ask. It only matters to the jury what is being testified to by the jury those people who I have said may provide opinion testimony to you today and on the other days that we have sat. So whether there were other reports or other documents or whatever else is in those boxes of documents, is just not relevant for the jury's consideration in this case. And that is my ruling.[44]

The proffered *opinions* contained within the report of a co-defendant's non-testifying witness were hearsay, more prejudicial than probative, and Plaintiff has not cited to any hearsay exception that would allow such opinions to be used to impeach AGCO's expert. Moreover, the courts of this Commonwealth have continued to adhere to the longstanding precedent, set forth in *Pennsylvania Company for Insurances on Lives and Granting Annuities v. Philadelphia*[45], which holds that an opponent's non-testifying experts cannot be compelled to provide opinion

---

[44] N.T. 6/14/2018 p.m. at 112-115.

[45] 105 A. 630 (Pa. 1918).

25

testimony involuntarily.[46] It is the general principle in this Commonwealth that a witness cannot be compelled to give expert opinion testimony against his will.[47] Specifically, the Court stated:

> The process of the courts may always be invoked to require witnesses to appear and testify to any facts within their knowledge; but no private litigant has a right to ask them to go beyond that. [. . .] [T]he private litigant has no more right to compel a citizen to give up the product of his brain than he has to compel the giving up of material things. In each case it is a matter of bargain, which, as ever, it takes two to make, and to make unconstrained.[48]

Plaintiff has attempted to circumvent this precedent by likening the instant circumstances to those in *Boucher v. Pennsylvania Hospital[49]*, wherein our Superior Court established a very limited exception to the general prohibition against compelling an expert witness to provide opinion testimony against his will. The nature of the testimony and the relationship between the parties renders the *Boucher* exception inapplicable to the instant case.

In *Boucher*, Plaintiffs alleged that employees of Pennsylvania Hospital negligently caused or failed to prevent a traumatic injury to the minor Plaintiff in the hours after she was born. Pennsylvania Hospital presented the expert testimony of Dr. Robert Stavis, who testified, in relevant portion, that there was no evidence of traumatic injury to the minor Plaintiff in "any of the records, films, or reports" and further testified that there was no evidence of cephalohematoma.[50] Plaintiff sought to cross-examine Dr. Stavis with the report of Dr. Orest Boyko, another Pennsylvania Hospital expert who was not called to testify at trial. Dr. Boyko's report "stated that there was evidence of 'resolving cephalohematoma'" and Dr. Stavis testified

---

[46] *Pennsylvania Company for Insurances on Lives and Granting Annuities,* 105 A. at 630.

[47] *Pennsylvania Company for Insurances on Lives and Granting Annuities,* 105 A. at 630; *see Evans v. Otis Elevator Co.,* 168 A.2d 573 (Pa. 1961); *Spino v. John S. Tilley Ladder Co.,* 671 A.2d 726 (Pa. Super. 1996); *Columbia Gas Transmission Corp. v. Piper,* 615 A.2d 979 (Pa. Cmwlth. Ct.1992); *Jistarri v. Nappi,* 549 A.2d 210 (Pa. Super. 1988); *see also Boucher v. Pennsylvania Hosp.,* 831 A.2d 623, 626 (Pa. Super. 2003) (affirming general principle and establishing limited exception).

[48] *Pennsylvania Company for Insurances on Lives and Granting Annuities,* 105 A. at 630.

[49] 831 A.2d 623 (Pa. Super. 2003).

[50] *Boucher,* 831 A.2d at 629-30.

26

to having reviewed Dr. Boyko's report.[51] As such, Plaintiff sought to use Dr. Boyko's report to challenge Dr. Stavis' credibility and his testimony that none of the records or reports he reviewed supported the presence of cephalohematoma.[52] The trial court precluded the cross-examination with Dr. Boyko's report and, following a defense verdict, Plaintiffs appealed.

On review, the Superior Court reaffirmed the longstanding precedent of the courts, stating "[w]e are mindful of the rule expressed and applied by the courts of this Commonwealth that one party may not compel an expert for the opposing party to divulge his expert opinion."[53] However, the Court determined that the general rule does not preclude the use of an expert report in one limited circumstance and the Court neatly carved out the following exception:

> Where an expert report is disclosed to another expert and reviewed by that expert, and then by his testimony the expert mischaracterizes that report, either explicitly or by implication, we conclude that basic fairness and the entitlements of cross-examination permit the disclosure of that report to the degree necessary to expose the mischaracterization by the testifying expert. In such circumstances, the report, or portion thereof, is not admitted as substantive evidence, as we note below, and thus its use, we find, is not barred by the rule expressed above in *Spino* and *Columbia Gas*.[54]

In the instant matter, Plaintiff sought to have the *Boucher* exception applied to the cross-examination of Mr. Murray and Mr. Ney; however, such exception is not applicable based on significant distinctions between the circumstances of this case and those in *Boucher,* set forth as follows:

First, the most glaring difference between *Boucher* and the case at bar is that *Boucher* allowed the cross-examination of an expert with the report of a non-testifying expert *for the same party*, not a co-defendant as was the case here. Here, Plaintiff was attempting to use the

---

[51] *Boucher,* 831 A.2d at 629-30.

[52] *Boucher,* 831 A.2d at 631.

[53] *Boucher,* 831 A.2d at 632.

[54] *Boucher,* 831 A.2d at 632.

report of MM Weaver's non-testifying experts to cross-examine AGCO's expert witnesses and, thus, this Court properly sustained the objections.

Second, the expert opinion at issue in *Boucher* revolved around medical diagnoses. Medical experts opining on medical treatment and diagnoses routinely rely upon the facts and data contained within the opinions of other medical experts in reaching their own opinions. Accordingly, medical experts are allowed to provide the jury with hearsay testimony regarding facts or data used in reaching their opinions on both direct and cross-examination in accordance with Pennsylvania Rule of Evidence 703. Further, it is well established in our case law that medical experts "are permitted to express opinions which are based, in part, upon reports which are not in evidence, but which are customarily relied upon by experts in the practice of the profession."[55] While Plaintiff has attempted to benefit from this precedent by only citing the portions of *Collins v. Cooper*[56] and *Primavera v. Celotex Corp*[57] that use the term "expert", it is clear that these cases involve the discussion of *medical* experts only. The experts at issue in the instant matter were not medical experts, but rather experts in engineering. The hearsay testimony Plaintiff sought to introduce was not "facts and data" supporting the opinions of an expert, but rather was solely an opinion of a non-testifying expert supporting an abandoned cross-claim against AGCO. This is unlike the circumstances in *Boucher* where Plaintiff sought to use Dr. Boyko's report on cross-examination solely to impeach Dr. Stavis regarding the existence of cephalohematoma, an important fact in the *Boucher* case, not an opinion on the ultimate issue of negligence.[58]

---

[55] *Primavera v. Celotex Corp.*, 608 A.2d 515, 518 (Pa. Super. 1992).

[56] *Collins v. Cooper*, 746 A.2d 615 (Pa. Super. 2000).

[57] *Primavera v. Celotex Corp.*, 608 A.2d 515 (Pa. Super. 1992).

[58] Plaintiff's Motion in Limine at Control No. 18052312 sought to classify the Ezra & Huffman report as an admission, and therefore an exception to the rule against hearsay, by alleging that MM Weaver "concedes in its [e]xpert [r]eport of [Ezra & Huffman] that the subject [t]ractor was dangerously defective and that the defect was causative of [Plaintiff]'s severe injuries." This Court did not agree denied the Motion, as discussed above. *See*

28

Third, unlike *Boucher*, the at-issue hearsay that Plaintiff sought to put in front of the jury was of low probative value and was highly prejudicial to AGCO. Its admission would have been tantamount to forcing MM Weaver to pursue a cross-claim that it had chosen to forego and/or tantamount to forcing AGCO to defend MM Weaver's unpursued cross-claim.

Moreover, assuming arguendo that the preclusion of the opinions was error, such error was harmless given that Plaintiff *was able to impeach* Mr. Murray and Mr. Ney regarding the existence of other reports addressing liability and the necessity of occupant presence controls ("OPC"). Plaintiff was merely constrained from using the ultimate opinions of the Ezra and Huffman report.[59] Accordingly, given the nature of the testimony and the posture of the parties, this Court properly limited the cross-examination of AGCO's expert witnesses.

### 3. The trial court properly instructed the jury regarding the elements of a products liability claim

Plaintiff next avers that this Court improperly instructed the jury concerning the elements of a products liability claim in this Commonwealth. This Court disagrees. Our jurisprudence affirms that the trial court's objective in instructing the jury is "to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict."[60] In drafting a comprehensive set of instructions, the court has broad discretion in its phrasing, provided that "the law is clearly, adequately, and accurately presented to the jury for its consideration."[61]

---

*Wilkerson v. Allied Van Lines*, 521 A.2d 25 (Pa. Super. 1987) (concluding expert report provided in response to interrogatory requesting such report was not admission).

[59] *See also Comm. v. Harris*, 106 A.3d 183 (Pa. Cmwlth. Ct. 2014) (distinguishing case from *Boucher* and precluding cross-examination of Commonwealth's accident reconstruction expert and police officer witness with police accident report).

[60] *Com. v. Chambers*, 980 A.2d 35, 49 (Pa. 2009) (citing *Com. v. Hartman*, 638 A.2d 968, 971 (Pa. 1994)).

[61] *Com. v. Sepulveda*, 55 A.3d 1108, 1141 (Pa. 2012); *see also Marsico v. DiBileo*, 796 A.2d 997, 1000 (Pa. Super. 2002) (providing that "a trial judge has wide latitude in his or her choice of language when charging a jury, provided always that the court fully and adequately conveys the applicable law.").

29

Upon review, the court's instruction must be viewed in its entirety when assessing whether prejudicial error resulted, as isolated inaccuracies will not warrant post trial relief.[62] Our Supreme Court has consistently held that a trial judge's instruction to the jury will be deemed adequate "unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error."[63] Further, any challenge to the trial judge's instructions must properly preserved. The mere filing of a proposed instruction to the docket along with the subsequent raising of the issue by post-trial motion is not sufficient to secure appellate review.[64] As stated by Our Supreme Court in *Jones v. Ott*[65]

> [t]aken together, our rules of civil and appellate procedure, and our longstanding principles of preservation and waiver, dictate that, while a jury-charge challenge can be preserved under Pa.R.C.P. 227.1 by making proposed instructions part of the record and by raising the issue in a post-trial motion, the challenge is waived when the appellant fails to secure a record ruling from the trial court upon the proposed charge.[66]

In the instant case, Plaintiff makes a claim of error with regard to the strict product liability standard and the risk-utility standard, as provided by this Court in its instructions to the jury. Plaintiff's claim is without merit, as this Court's instructions were properly guided by the parameters set forth in the Restatement (Second) of Torts § 402A and our Supreme Court's decision in *Tincher v. Omega Flex, Inc.*[67]

Section 402A of the Second Restatement provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
    (a) the seller is engaged in the business of selling such a product, and

---

[62] *Wilkerson v. Allied Van Lines, Inc.*, 521 A.2d 25, 32 (Pa. Super. 1987).

[63] *Com. v. Chambers*, 980 A.2d 35, 50 (Pa. 2009) (citing *Von der Heide v. Com., Dep't of Transp.*, 718 A.2d 286, 288 (Pa. 1998)).

[64] *Jones v. Ott*, 191 A.3d 782, 788-89 (Pa. 2018).

[65] 191 A.3d 782 (Pa. 2018).

[66] *Jones v. Ott*, 191 A.3d 782, 788 (Pa. 2018).

[67] 104 A.3d 328 (Pa. 2014).

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.[68]

The treatment of the principles encompassed within the phrase "defective condition unreasonably dangerous" was central to the *Tincher* Court's analysis of products liability jurisprudence, its express overruling the *Azzarello v. Black Bros. Co.*[69] precedent, and its decision not to adopt the standard set forth in the Third Restatement of Torts.

Prior to *Tincher*, the dispositive question in a strict products liability action was whether the product was safe for its intended use and the existing precedent emphasized that the seller was the guarantor of the product.[70] As set forth by the *Azzarello* Court:

> [t]he (supplier) of a product is the guarantor of its safety. The product must, therefore, be provided with every element necessary to make it safe for (its intended) use, and without any condition that makes it unsafe for (its intended) use. If you find that the product, at the time it left the defendant's control, lacked any element necessary to make it safe for (its intended) use or contained any condition that made it unsafe for (its intended) use, then the product was defective, and the defendant is liable for all harm caused by such defect.[71]

Moreover, the *Azzarello* Court determined that:

> the phrases "defective condition" and "unreasonably dangerous" as used in the Restatement formulation are terms of art invoked when Strict liability is appropriate. It is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint. They do not fall within the orbit of a factual dispute which is properly assigned to the jury for resolution. A standard suggesting the existence of a "defect" if the article is unreasonably dangerous or not duly safe is inadequate to guide a lay jury in resolving these questions.[72]

---

[68] Restatement (Second) of Torts § 402A (1965).

[69] 391 A.2d 1020 (Pa. 1978).

[70] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 367 (Pa. 2014).

[71] *Azzarello v. Black Bros. Co.*, 391 A.2d 1020, 1027 n.12 (Pa. 1978) (quoting Pennsylvania Standard Jury Instruction 8.02 (Civil), Subcommittee Draft (June 6, 1976).

[72] *Azzarello v. Black Bros. Co.*, 391 A.2d 1020, 1026 (Pa. 1978). In its discussion of the products liability jurisprudence of this Commonwealth, the *Tincher* Court succinctly summarized that the *Azzarello* Court had found

In overruling *Azzarello*, the *Tincher* Court rejected the characterization of the Second Restatement as a predictor of responsibility not to be utilized in providing instruction to the jury.[73] The *Tincher* Court, in returning the assessment of whether a product is "unreasonably dangerous" to the jury, determined that:

> the notion that a legal inquiry into "whether that condition justifies placing liability upon the supplier" (product is unreasonably dangerous) is, albeit distinguishable, entirely separable from a factual inquiry into the predicate "condition of a product" (defective condition of product) when determining whether to affix liability upon a supplier is incompatible with basic principles of strict liability. Thus, in a jurisdiction following the Second Restatement formulation of strict liability in tort, the critical inquiry in affixing liability is whether a product is "defective"; in the context of a strict liability claim, whether a product is defective depends upon whether that product is "unreasonably dangerous."[74]

Having acknowledged the shortcomings of the existing *Azzarello* standard of proof and having found such standard to be unsustainable, the *Tincher* Court examined the utility of the consumer expectations standard as well as the risk-utility standard. Under the consumer expectations test, a "defective condition" is defined as "a condition, upon normal use, dangerous beyond the reasonable consumer's contemplations."[75] A product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer.[76] By contrast, the risk-utility test offers a cost-benefit analysis wherein a product is in a defective condition if a reasonable person would conclude that the probability and seriousness of harm caused by the product

---

that "the best means to implement the principles of the Second Restatement was to direct: (1) that the phrases "defective condition" and "unreasonably dangerous," which predict whether recovery would be justified, are issues of law and policy entrusted solely for decision to the trial court; and (2) that the inquiry into whether a plaintiff has proven the factual allegations in the complaint is a question for the jury." *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 367 (Pa. 2014).

[73] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 399-408 (Pa. 2014).

[74] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 380 (Pa. 2014).

[75] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 387 (Pa. 2014).

[76] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 387 (Pa. 2014).

outweigh the burden or costs of taking precautions.  The factors relevant to such assessment

include:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
> (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
> (6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
> (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.[77]

Mindful of the limitations and policy concerns associated with of each of these tests, the *Tincher*

Court declined to affirmatively adopt one or the other and, instead, determined that a composite

standard would provide the appropriate standard of proof in a claim of strict product liability as it

"retains the best functioning features of each test, when applied in the appropriate factual

context."[78]  Specifically, *Tincher* held that:

> a plaintiff pursuing a cause upon a theory of strict liability in tort must prove that the product is in a "defective condition." The plaintiff may prove defective condition by showing either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer, or that (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions. The burden of production and persuasion is by a preponderance of the evidence.[79]

In setting forth this new adaptable standard, the Court acknowledged the complex nature

of strict products liability actions and determined that our jurisprudence must develop from the

---

[77] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 389-90 (Pa. 2014).
[78] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 401 (Pa. 2014).
[79] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 335 (Pa. 2014).

factual circumstances presented on a case by case basis rather than from a bright line rule.[80] The Court concluded that "it is incumbent upon the parties, through their attorneys, to aid courts in narrowing issues and formulating appropriate instructions to guide juries in their factual determinations...."[81] In the course of formulating the appropriate instructions for the jury on products liability claims, the trial court has two critical roles: first, the trial court must act as the gatekeeper to ensure that the each theory presented to the jury – whether it be consumer expectations, risk-utility, or both – are warranted by the evidence presented at trial.[82] Second, the court must clearly explain the meaning of 'defective condition' as relevant to the applicable facts and within the boundaries of Section 402A of the Second Restatement and controlling caselaw.[83]

In the instant matter, Plaintiff avers that this Court improperly rejected his proposed instruction on strict products liability and further avers that this Court omitted factors that a jury should consider in conducting the risk-utility analysis of defect, as set forth in *Tincher*.[84] This Court disagrees, as this Court properly instructed the jury in accordance with *Tincher* and Section 402A of the Second Restatement.

Plaintiff's first claim of error regarding the jury instruction on strict products liability is frivolous, as Plaintiff's proposed instruction set forth the language of the *Azzarello* standard which was patently overruled by the *Tincher* Court. Plaintiff provided the following proposed instruction:

---

[80] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 406 (Pa. 2014).
[81] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 406 (Pa. 2014).
[82] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 406-407 (Pa. 2014).
[83] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 408 (Pa. 2014).
[84] Plaintiff also included the text of his proposed charges on defective condition, specifically concerning the consumer expectations standard and the hindsight test during risk benefit analysis; however, such instructions were not addressed in Plaintiff's argument and the content of these instructions was provided to the jury in the Court's charge. Accordingly, this Court need not address them in the instant Opinion.

34

**STRICT PRODUCT LIABILITY**
A product is defective it [does] not contain each and every element necessary to make it safe for its intended use. This determination is made at the time the product is manufactured and initially sold, which, in this case, is in the 2005-2006 timeframe.

This Court properly declined to provide the jury with this misstatement of the law. Instead, this

Court instructed the jury as follows:

> Plaintiff claims liability under a products liability theory that he was harmed by the tractor at issue which was designed and manufactured by [AGCO] and originally sold by M.M. Weaver in 2005 and then resold by M.M. Weaver in 2008. Under this legal theory of products liability, liability is imposed on the manufacturer who places a product into the market in a defective condition unreasonably dangerous to users of the product. Such defendant is liable for physical harm to the user of the product caused by a defective condition in the product if the defendant is engaged in the selling or manufacturing of the product at issue and the product is expected to and does reach the user without substantial change in the condition of the product. Under the law, a defendant such as AGCO who designs and manufactures a defective product is strictly liable for their injuries caused by such defect even if the manufacturer has taken all possible care in the design and manufacture of the product.is imposed on the manufacturer who places a product into the market in a defective condition unreasonably dangerous to users of the product. Such defendant is liable for physical harm to the user of the product caused by a defective condition in the product if the defendant is engaged in the selling or manufacturing of the product at issue and the product is expected to and does reach the user without substantial change in the condition of the product. Under the law, a defendant such as AGCO who designs and manufactures a defective product is strictly liable for their injuries caused by such defect even if the manufacturer has taken all possible care in the design and manufacture of the product.[85]

This Court's instruction properly conveyed the principles of Section 402A of the Second

Restatement and omitted any language harkening back to *Azzarello* wherein the supplier of a

product was the guarantor of its safety.[86]

---

[85] N.T. 6/19/2018 at 197-198.

[86] As stated by our Superior Court in *Tincher v. Omega Flex, Inc.* 180 A.3d 386 (Pa. Super 2018) ("Tincher II"):
The charge thus contained all of the product liability law under *Azzarello* that the Supreme Court has now disapproved, including a definition equating a defective product with one that "leaves the suppliers' control lacking any element necessary t make it safe for its intended use," and a

35

Plaintiff's next claim of error, concerning the factors provided to the jury for consideration in a risk-utility theory of defect, also lacks merit. The *Tincher* Court provided a lengthy discussion of the risk-utility theory of defect, as discussed above, and observed that other jurisdictions have relied upon the scholarly works of Dean Wade articulating seven factors "relevant to the manufacturer's risk-utility calculus implicated in manufacturing or designing a product."[87] The Court, however, did not affirmatively adopt these factors and further noted that "while these considerations may provide a holistic perspective on a manufacturer's choice to bring a product to market, they may not be immediately responsive in the (typical) case implicating allegations relating to a particular design feature."[88] As discussed above, the Court declined to adopt a bright line rule and contemplated the consumer expectations standard and the risk utility standard as "comprehensive guidelines that are sufficiently malleable to account for product diversity and a variety of legal claims, products, and applications of theory.[89] The ultimate task of the trial court is to clearly explain the meaning of 'defective condition' as relevant to the applicable facts and within the boundaries of Section 402A of the Second Restatement and controlling caselaw.[90]

In explaining the concept of "defect" under a risk-utility theory, this Court instructed the jury that:

> Plaintiff must prove by a preponderance of the evidence that the product at issue was defective at the time it left AGCO's control in 2005, and such defective condition of the product was a legal, that is, factual cause, of Mr. Timmonds' harm.
>
> Now, Defendant AGCO denies that the at-issue tractor was in a defective condition unreasonably dangerous to the users of such tractor. Defendant AGCO

---

declaration that a manufacturer "is really a guarantor of [a product's] safety" but not "an insurer of [that] safety." The Supreme Court has now overruled *Azzarello* and determined that this statement of product liability law was incorrect. The trial court's jury charge, therefore, was erroneous.

[87] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 389 (Pa. 2014).
[88] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 390 (Pa. 2014).
[89] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 408 (Pa. 2014).
[90] *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 408 (Pa. 2014).

further denies that the design of the at-issue tractor was a factual cause of plaintiff's harm and asserts that the tractor was not being used for its intended use, nor was it used in an unintended but foreseeable way. Defendant further asserts that the guard had been removed and, thus, the product did not reach the intended user without substantial change in its condition. Whether plaintiff has proven that the tractor at issue was defective and was a factual cause of his injuries, is for you to decide. The fact that I instruct you about the elements of the charges and defenses does not imply any opinion on my part as to what your verdict should be.

Now, let me explain these elements in defect and causation in more detail. This is Question 1. You will see that it's asking you about this question of defect. Again, you will have this written charge with you in the back at some point when those typos are corrected. You will have it in the back for you if you need it to review. The charge with regard to defect is as follows: It is for you to decide whether plaintiff has proven that the at-issue tractor was in a defective condition unreasonably dangerous to the intended or foreseeable user at the time AGCO placed the tractor into the market in 2005.

Let me now give you further instructions as to what plaintiff must prove with regard to defect. Plaintiff may prove that the at-issue tractor was defective if plaintiff proves by a preponderance of the evidence one of the three following theories of defect. So you will see when I am reviewing it for you, the plaintiff doesn't need to prove all three of these; the plaintiff may prove one of three.

[. . .]

The second -- remember it's and/or not an and -- the tractor was unreasonably dangerous because a reasonable person would conclude that the possibility and seriousness of harm posed by the product as designed outweighed the burden or cost of taking precautions. You may consider the following factors: The seriousness of the potential harm resulting from the foreseeable use of the product as designed; the likelihood that the harm would occur when used in a foreseeable manner; the feasibility of an alternative safer design or other safety precautions at the time of the manufacture or sale of the product; the cost of an alternate design or other safety precautions, and disadvantages of an alternate design or other safety precautions. A manufacturer/seller of a product is presumed to have known at all relevant times the facts that have been revealed about the harmful characteristics or consequences of the product's design. If you find that it would not be reasonable for such defendant with such presumed knowledge to have put the product in the market without changing the design, then the product is defective. That's the second theory.[91]

While this instruction was not a verbatim recitation of the Wade factors, as requested by

Plaintiff, the instruction properly presented the jury with the concepts applicable to the instant

matter. Here, Plaintiff was injured by the at-issue AGCO Massey Ferguson 451 Agricultural

---

[91] N.T. 6/19/2018 at 199-201, 202-203.

Utility Tractor while attempting to hotwire/jumpstart/bypass start the tractor while it was in gear. At the heart of the case against AGCO was the determination as to whether the movement of the tractor, resulting from the way it was used, was a foreseeable event or whether the movement of the tractor resulted from an unintended misuse. Accordingly, this Court crafted a set of instructions conveying all of Plaintiff's theories of defect (consumer expectations, risk-utility, and failure to warn), explaining factual cause, and providing AGCO's affirmative defenses of substantial alteration, misuse, and assumption of the risk. With regard AGCO's affirmative defense of misuse, this Court instructed the jury as follows:

> The defense is raising three what we call affirmative defenses in the products liability action that other conduct was the independent factual cause or sole factual cause, and, therefore, they are not liable for the injury.
> [. . .]
> Let me discuss the second affirmative defense of what the law calls misuse of the product. Under this defense, the products liability defendant asserts that the tractor was not used in its intended manner and that this misuse was an independent factual cause of the accident that if proven, relieves it from liability to the plaintiff. The law is that a manufacturer of a product is not liable for harm caused by the use of a product in a way that was unintended and unforeseeable. To succeed in this defense, the relevant defendant must prove by a preponderance of the evidence that the tractor at issue was used in an unintended way and the use was so extraordinary that it was not reasonably foreseeable to the relevant defendant, and, therefore, should be considered as the independent cause of plaintiff's harm. Plaintiff denies this defense. This issue is for you to decide. And I just remind you there can be more than one factual cause.[92]

In assessing this Court's charge in its entirety, it is clear that all of Plaintiff's theories of defect, including the risk-utility analysis, were comprehensively and accurately explained to the jury in accordance with *Tincher* and Section 402A of the Second Restatement.

---

[92] N.T. 6/19/2018 at 208-09, 210-11.

**4. The trial court properly denied Plaintiff's pre-trial Motion to Preclude Admission of Evidence Regarding the Negligence of George E. Ley Co.**

Plaintiff next contends that this Court improperly allowed evidence of George E. Ley Co.'s negligence by denying two Motions in Limine, and by doing so, further allowing certain cross-examination of Plaintiff's expert, Charles Miller, and further allowing certain closing arguments of the Turf Defendants and MM Weaver. This Court disagrees.

On May 29, 2018, Plaintiff filed a Motion in Limine (Control No. 18053809) to preclude any evidence, argument, or testimony, that Plaintiff's employer, George E. Ley, Co., was negligent, to which the Turf Defendants filed their opposition on June 4, 2018. On June 4, 2018, this Court docketed an Order denying the motion to the extent that the purported conduct of George Ley was relevant to the factual cause of the incident and without prejudice to raise objections at trial. Similarly, on May 17, 2018, Plaintiff filed a Motion in Limine (Control No. 18052308) to preclude any evidence, testimony or argument regarding parties that had been dismissed, to which AGCO filed its opposition on May 29, 2018 and MM Weaver joined in the opposition. On June 4, 2018, this Court docketed an Order denying the motion without prejudice for all parties to raise objections at trial and deferring the issue of dismissed parties for further argument as to the applicability of either Section 303(b) of the Workers' Compensation Act at 77 P.S. § 481 or the Fair Share Act at 42 Pa.C.S.A. § 7102(a.2).

Section 303(b) of the Workers' Compensation Act provides:

> In the event injury or death to an employee is caused by a third party, then such employe, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to receive damages by reason thereof, may bring their action at law against such third party, but the employer, his insurance carrier, their servants and agents, employes, representatives acting on their behalf or at their request shall not be liable to a third party for damages, contribution, or indemnity in any action at law, or otherwise, unless liability for such damages, contributions or indemnity shall be expressly provided for in a written contract

entered into by the party alleged to be liable prior to the date of the occurrence which gave rise to the action.[93]

The Fair Share Act at 42 Pa.C.S. § 7102(a.2) states:

> For purposes of apportioning liability only, the question of liability of any defendant or other person who has entered into a release with the plaintiff with respect to the action and who is not a party shall be transmitted to the trier of fact upon appropriate requests and proofs by any party. **A person whose liability may be determined pursuant to this section does not include an employer to the extent that the employer is granted immunity from liability or suit pursuant to the act of June 2, 1915 (P.L. 736, No. 338), known as the Workers' Compensation Act.** An attribution of responsibility to any person or entity as provided in this subsection shall not be admissible or relied upon in any other action or proceeding for any purpose. Nothing in this section shall affect the admissibility or nonadmissibility of evidence regarding releases, settlements, offers to compromise or compromises as set forth in the Pennsylvania Rules of Evidence. Nothing in this section shall affect the rules of joinder of parties as set forth in the Pennsylvania Rules of Civil Procedure.[94]

Subsection (a.2), while expanding the scope of persons to be submitted to the factfinder for apportionment of liability, specifically excluded employers from any such apportionment.

While the above legislation precludes a third party from bringing *an action* in tort or seeking apportionment against the employer, whether through an independent cause of action or through a joinder into an existing action, neither Act by its terms precluded AGCO, MM Weaver, or the Turf Defendants from contesting the actual cause of Plaintiff's accident or contesting that Plaintiff could meet his burden of proof regarding the cause of the incident at issue. Here, neither AGCO, MM Weaver, nor the Turf Defendants ever sought to place Ley on the verdict sheet.[95] As such, no violation of the specific terms of either Act occurred.

---

[93] 77 P.S. § 481.

[94] 42 Pa.C.S.A. § 7102(a.2) (emphasis added).

[95] Plaintiff had named Ley as an original defendant in the action, but Plaintiff, AGCO, and the Eastern Irrigation entered a Stipulation on April 12, 2016, prior to the filing of the Amended Complaint, that all claims and cross-claims against Ley were dismissed.

During argument on the motions and in this Court's pre-trial rulings on the motions, this Court contemplated that the applicability of Section 303(b) of the Workers' Compensation Act at 77 P.S. § 481 or the Fair Share Act at 42 Pa.C.S.A. § 7102(a.2) as to any dismissed parties could be deferred for further argument following the close of evidence and creation of the verdict sheet. While Plaintiff initially named other parties as Defendants, no dismissed parties ever appeared on the verdict slip and, thus, the protections defined within the Workers' Compensation Act and the Fair Share Act provide no source of error. Accordingly, as neither Act precluded this Court's evidentiary rulings at trial and because Plaintiff cannot point to any portion of the transcript where an item of evidence was admitted at trial, over objection, in reliance on the Acts, Plaintiff's claim of error is meritless.

In addition to the meritless claim of error related to the Workers' Compensation Act and the Fair Share Act, Plaintiff challenges the admission of evidence at trial regarding the conduct of Ley based upon prevailing case law. The instant case presented a thorny evidentiary landscape due to the differing legal claims among the parties. Plaintiff's theories of liability as to AGCO were related solely to the production of a defectively designed product.[96] Plaintiff's theories of liability as to MM Weaver were twofold: one was based on the sale of a defectively designed product and the other was an independent claim of negligence for the sale of the tractor without a guard or a manual. Plaintiff's theory of liability as to the Turf Defendants was that they had removed the guard and resold the tractor back to MM Weaver without the guard. AGCO's primary defenses were that the product had been changed substantially by the removal of the guard and that the Plaintiff's hotwiring/jumpstarting of the tractor was not an intended use,

---

[96] Plaintiff asserted a negligent design defect and strict liability design defect claim against AGCO; however this Court directed verdict in favor of AGCO on the negligent design defect theory as discussed above in Plaintiff's first claim of error.

41

and this combined misuse was the sole cause of the incident. The Turf Defendants' and MM Weaver's primary defenses were that Ley, or one of Plaintiff's co-workers, had removed the guard, not them; therefore, Plaintiff could not meet his burden of proving that the conduct of either the Turf Defendants' or MM Weaver, prior to the sale to Ley, was a factual cause of the incident. Accordingly, this Court ruled that evidence of Ley's actions and/or inactions concerning the removal of the guard was **relevant to the causation defenses** and that the probative value far outweighed any prejudice to Plaintiff. It was the above legal theories pursued by Plaintiff, and the concomitant defenses, that guided this Court's evidentiary rulings as to relevance.

In Plaintiff's arguments for a new trial, he mischaracterize the available Pennsylvania caselaw regarding these evidentiary issues in an attempt to manufacture a precedent that evidence of an employer's conduct is inadmissible at trial. This is simply not the case. Plaintiff has relied upon the Supreme Court's holdings in *Bell v. Koppers Co.*, 458, 392 A.2d 1380 (Pa. 1978), *Tsarnas v. Jones & Laughlin Steel Corp.*, 412 A.2d 1094 (Pa. 1980), and *Heckendorn v. Consolidated Rail Corp.*, 465 A.2d 609 (Pa. 1983); however, these decisions were all rendered with regard to the disposition of preliminary objections to the joinder of an employer for contribution and indemnification wherein the Court held that Section 303(b) of the Workers' Compensation Act prohibited such *cause of action*. None of these cases addressed the admissibility of evidence of an employer's conduct to defend on the issue of the cause of the incident at issue, nor do these cases provide authority for Plaintiff's claim that evidence of an employer's conduct is inadmissible at trial. By contrast, our federal jurisprudence has explicitly

42

held that an employer's statutory immunity from suit "does not *per se* preclude admission of employer or co-worker negligence in a suit against a third party."[97]

This Court's disposition of the admissibility of the conduct of Ley was not based on a statutory or precedential bright line rule permitting the admission of the at-issue evidence, but instead was properly guided by the Pennsylvania Rules of Evidence, which afford the trial court the ability to assess the facts and circumstances of a particular case in order to make the appropriate ruling, and to defer rulings on who will be on the verdict sheet for the time after all of the evidence has been presented. The Pennsylvania Rules of Evidence dictate that all relevant evidence is admissible and evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action.[98] Rule 403 permits the court to exclude otherwise relevant evidence if its probative value is outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, and/or needlessly presenting cumulative evidence.[99] In clarifying the parameters of "unfair prejudice" our Superior Court has stated that prejudice "does not mean detrimental to a party's case, but rather, an undue tendency to suggest a decision on an improper basis."[100]

Plaintiff alleged that the Turf Defendants were negligent in removing the guard covering the solenoid starter sometime between 2006 and 2008 when the Turf Defendants had the at-issue

---

[97] *Kern v. Nissan Indus. Equip. Co.*, 801 F. Supp. 1438, 1445 (M.D. Pa. 1992). The *Kern* Court referenced similar holdings from other districts, citing to *Stolarik v. Hendrick Mfg. Corp.*, 767 F.Supp. 88 (M.D.Pa.1991), *aff'd without opinion*, 961 F.2d 210 (3d Cir.1992) and *Brescia v. Ireland Coffee–Tea, Inc.*, 73 F.R.D. 673 (E.D. Pa.1977). In *Stolarik*, the Court declined to instruct the jury that Plaintiff's employer was immune from suit and that any negligence imputed to it was irrelevant and did not provide a defense to Plaintiff's strict liability claim against the defendant manufacturers. *Stolarik*, 767 F.Supp. at 89-90. The *Brescia* Court determined that it was permissible for the defendant to argue that third-party's actions wholly responsible for plaintiff's injuries, despite the third party being immune from suit. *Brescia*, 73 F.R.D. at 678
[98] Pa.R.E. 401- 402.
[99] Pa.R.E. 403.
[100] *Leahy v. McClain*, 732 A.2d 619, 624 (Pa. Super. 1999).

43

tractor. Plaintiff also alleged that MM Weaver was negligent for selling the at-issue tractor to Ley in 2008 without the guard covering the solenoid starter and/or without the operator manual. In a negligence action, Plaintiff has the burden of proving, by a preponderance of the evidence, that the harm suffered was due to the conduct of the defendant.[101] The assessment of whether Plaintiff has met this burden is most often a jury determination, unless "it is clear that reasonable minds could not differ on the issue."[102] As stated by our Supreme Court, "[i]n establishing a prima facie case, the plaintiff need not exclude every possible explanation of the accident; it is enough that reasonable minds are able to conclude that the preponderance of the evidence shows defendant's conduct to have been a substantial cause of the harm to plaintiff."[103] Here, the determination of liability in Plaintiff's negligence claims for the absence of the guard and manual required the jury to assess when the guard and the manual were removed and by whom. Accordingly, evidence of Ley's actions and/or inactions concerning the removal of the guard and the manual were critical to MM Weaver and Turf Defendants' defenses related to their own liability.

Moreover, because Plaintiff was pursuing negligence claims against Turf Defendants and MM Weaver, these Defendants were pursuing their own claims of comparative negligence against Plaintiff with regard to his operation of the tractor. To defend against the claims of comparative negligence, Plaintiff himself introduced evidence that he only jumpstarted the tractor because of his employer's instructions, thereby interjecting Ley's lackluster training of employees and Ley's condoning of the purported misuse.[104]

---

[101] *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978).
[102] *Hamil*, 392 A.2d at 1285.
[103] *Hamil*, 392 A.2d at 1285.
[104] N.T. 6/5/2018 at 44-47.

44

For all of the reasons set forth above, this Court rejects and denies Plaintiff's averments that this Court improperly allowed evidence of George E. Ley Co.'s negligence to be admitted at trial by denying two Motions in Limine.

### 4a. Introduction of evidence through the cross-examination of Charles Miller

In addition to generally raising the issue that the conduct of Ley should not have been allowed as evidence at trial, Plaintiff has raised the specific claim of error concerning the testimony elicited on cross-examination of Plaintiff's witness, Charles Miller. While the greater part of Plaintiff's claims related to the cross-examination of Charles Miller were not objected to and may be deemed waived, this Court has chosen to address the testimony, as one objection was preserved.

At trial, Plaintiff called Charles Miller as an expert in inspection, maintenance, and sale of agricultural equipment based upon his experience as a mechanic.[105] In Plaintiff's direct examination of Mr. Miller, Plaintiff elicited Mr. Miller's opinion that, at the time of equipment inspection, he would expect all guards, manuals and decals to be in place and that he would replace anything he found to be missing. The pertinent portion of Mr. Miller's direct examination provides the following:

> **BY MR. BUDNER:**
> **Q.** Do you expect that guards are going to be removed when you're inspecting equipment?
> **MR. FOWLER:** Objection.
> **THE COURT:** Overruled.
> **THE WITNESS:** No, sir. Guards should and usually are in place.
> **BY MR. BUDNER:**
> **Q.** Do you expect that decals will be removed?
> **A.** No, sir.

---

[105] The Turf Defendants objected to the scope of Mr. Miller's expertise and this Court ruled that any of Mr. Miller's opinions should be based upon his experience and should not be elicited as to what a reasonable person would do. See N.T. 6/8/2018 at 147-157.

45

Q. Do you expect that manuals will be removed?

A. No, sir. They should be with the equipment.

Q. If the decals and guards and manuals are removed, you go out and find those things, correct, and replace them?

A. Yes. That's part of the inspection process.

Q. In this case from your review of the records, was any inspection done of the Massey Ferguson 451 before it was sold to George Ley?

A. I have seen no evidence that it was inspected. I have seen no literature that anybody inspected it.

Q. In fact, we have just gone through the sale documents. It was sold before it was actually inspected in trade-in, right?

MR. DEMARCO: Objection. The dates of the invoices speak for themselves. This man has no knowledge --

THE COURT: Stop. You can certainly make those arguments as to inferences for our jury. This witness is in no better spot to answer that than the jury is.

BY MR. BUDNER:

Q. What is the first thing you inspect when you get a piece of equipment that is for purchase or sale?

A. I typically inspect the -- what we consider the safety aspects of the equipment: The steering, the brakes, the throttle controls, transmission controls. Any safety items such as seat belts, obviously, guards, the decals we talked about earlier, to be sure the machine is safe and ready] for operation.

Q. Is failing to inspect those safety systems a deviation from the standard of care in your industry inspecting agricultural equipment?

MR. FOWLER: Objection. He asked purchased or sale.

THE COURT: Just clarify the question that you're asking.

MR. BUDNER: He says he inspects --

THE COURT: To him. Make sure.

BY MR. BUDNER:

Q. In your inspections in your industry, not inspecting those very safety systems, the guards, the decals, the manuals, is that something that deviates from the standard of care within your industry?

MR. FOWLER: Same objection.

THE COURT: Sustained. You can just ask in a way about what he would expect, things like that.

BY MR. BUDNER:

Q. Would you expect someone inspecting equipment to look for the guards?

MR. FOWLER: Here's my objection --

THE COURT: No.

MR. FOWLER: -- just for sale --

THE COURT: I will overrule the objection.

THE WITNESS: From a mechanical standpoint, all of these things should always be in place, and you, as a mechanic, it's part of your job to be sure they're there. If you remove something, it's part of your job to put it back.

BY MR. BUDNER:

Q. That's part of every inspection, sir?

46

**MR. FOWLER:** Same objection.

**THE COURT:** Overruled.

**THE WITNESS:** As a mechanic, yes, sir.[106]

Subsequently, on cross examination, MM Weaver questioned Mr. Miller regarding the actions that Ley had taken with regard to the guard and the manual on the at-issue tractor. This testimony was elicited to infer that Ley had removed the guard and was in response to his above-referenced opinion inferring a faulty inspection by MM Weaver, as the jury would have to determine when the guard was removed from the tractor and who was responsible for removing it. Specifically, the cross-examination provided the following testimony (and Plaintiff's claims of error are indicated in boldface type):

**[BY MR. DEMARCO]**

Q. When did you first see the tractor?

A. I seen the photos of the tractor.

Q. You never actually seen the tractor itself?

A. No, sir. I looked at dozens and dozens of photographs.

**Q. Fair enough. Did you look at photographs taken of the tractor in 2016? June of 2016 I believe it was the first photographs that were produced with regard to the tractor.**

A. I believe so, yes, sir.

**Q. You will agree with me over a year, 15 months after Mr. Timmonds' accident, when those photos were taken, there was no guard over the solenoid, correct?**

A. That's correct.

**Q. So for a 15-month period of time, Ley allowed its employees to have that tractor after Mr. Timmonds' incident without replacing that cover?**

A. That's my understanding.

**Q. You will agree with me there was no manual with that tractor 15 months after Mr. Timmonds' incident?**

A. That's also what I read, yes.

**Q. There were pictures of this tractor taken in 2017. Did you see those about June of 2017?**

A. Yes, sir.

**Q. You will agree with me two years-plus after Mr. Timmonds' incident, there was still no cover over that solenoid?**

A. That's correct.

**Q. There was still no manual with that tractor?**

A. That's my understanding.

---

[106] N.T. 6/8/2018 at 176-180.

Q. Did you see pictures taken last month of this tractor, May of 2018?

A. I'm not sure. I might have.

Q. Can we agree that Mr. Ley still to this day has not replaced the cover on that solenoid?

A. I couldn't say one way or another. I haven't seen a picture of it, a solenoid with a cover on it.

Q. Ever?

A. No, sir.

Q. You haven't seen a picture of this tractor with a manual with it either, have you?

A. No, sir.

Q. In fact, the holder for the manual, there is a pocket which you place the manual in for this tractor, correct?

A. Yes.

Q. Up on the ROPS, there is a little vest there and you stick the manual in there correct?

A. Yes.

Q. Is that vest even with this tractor in the photos that you have seen?

A. I don't think so.

Q. Sir, you were not asked to address the safety practices or lack thereof of the George Ley Company, were you?

A. I was simply asked to address the mechanical safety aspect of this tractor.

Q. But you have competency to address the safety practices of Ley?

MR. BUDNER: Objection. He's not being offered in that capacity.

MR. DEMARCO: I will withdraw it.

BY MR. DEMARCO:

Q. You were in court when Mr. Hummer's deposition was played, correct, on Wednesday?

A. No, sir.

Q. Did you leave earlier than that?

A. Yes, sir.

Q. Sorry about that. You read his deposition, though?

A. I'm not sure I read Mr. Hummer's.

Q. Fair enough. You did read the deposition of Eugene Hurst, correct?

A. Yes.

Q. And he testified more than once at his deposition that when he sold this tractor, the cover was on the solenoid, correct?

A. Yes, sir.

Q. And he testified that the manuals were with the tractor when he sold this tractor, correct?

A. That's what I read, yes, sir.

Q. He testified that all the decals that were produced by the manufacturer were on this tractor when he sold it to Ley back in 2008, correct?

A. That was his testimony.

Q. You were not in court when Mr. Immel testified, correct?

A. No, sir.

Q. And you were not in court when Mr. Martin testified, correct?
A. No, sir.
Q. You understand Ley had in-house mechanics taking care of its own tractors, correct?
A. I remember reading that he had some people that did some work on the tractors.
Q. So for a seven-year period of time, Ley employees took care of this tractor, correct?
A. I haven't seen any records for that period.
Q. You didn't see the little maintenance book that Mr. Ley produced in the case?
A. I saw some of that, but I didn't see any invoices where anyone else had worked on it.
Q. It was all done in-house, to the best of your knowledge, during that seven-year period of time, correct?
A. According to the records I have seen.
Q. You haven't spoken to any of those mechanics?
A. No, sir.
Q. You don't know what they did or didn't do with this tractor over that seven-year period of time?
A. Just read their depositions.
Q. Depositions of the mechanics?
A. Well, some of the employees.
Q. There were no depositions of the mechanics, correct?
A. I didn't see any.
Q. In fact, Mr. Ley couldn't even tell us the names of the mechanics over that seven-year period of time. Are you aware of that?
A. Yes.[107]

This testimony was relevant and its probative value was not outweighed by a danger of unfair prejudice, as the negligence claims against both MM Weaver and the Turf Defendants hinged on a factual determination that the guard and manual had been removed **prior** to the sale to Ley. The evidence was properly presented to the jury on cross-examination and, as such, this Court's denial of Plaintiff's Motion in Limine provides no source of error. Moreover, this Court's Order denying the Motion in Limine was entered "without prejudice to raise objections at trial." Plaintiff only objected to one question of the cross-examination, which was withdrawn, and thus

---

[107] N.T. 6/8/2018 at 186-190.

any other challenges are waived and cannot be presented through a challenge to the Motion in Limine.

### 4b. Closing arguments of the Turf Defendants

With regard to the claim of error concerning portions of the Turf Defendants' closing arguments alleged to have improperly flowed from this Court's denial of the Motion in Limine, this Court finds the claim to be meritless. The cause of action against the Turf Defendants was solely based on the allegation that they removed the guard from the at-issue tractor. As such, evidence of Ley's actions and/or inactions concerning the removal of the guard was relevant to the Turf Defendants' factual defense related to their own liability and was not outweighed by a danger of unfair prejudice. The evidence presented at trial remained entirely circumstantial as to who removed the guard and both Plaintiff and the Turf Defendants argued their respective assessments of the evidence to the jury.[108] Plaintiff's closing remarks provided:

> Now, I want to mention the theories of liability against the other defendants, M.M. Weaver and the Turf defendants, or Sporting Valley, Mr. Fowler's clients. The issue against Sporting Valley is very simple. Do you -- when you analyze the evidence, analyze the scales and the preponderance, what does the evidence show us about when that guard was taken off? I will be the first one to tell you, I think I was the first one to tell you in opening statements, we don't have some magic testimony of some guy coming in to say, I took the guard off and here's when I did it. That simply isn't realistic. When you go to bed at night and there is no snow on the ground and you wake up and there is snow, you don't have to have seen it snow to know it snowed.[109]
>
> [...]
>
> Hummer, Sporting Valley, Mr. Fowler's client hasn't presented any evidence that they didn't take off the guard. They tried to throw mud at George Ley. They said this is just a bad company that doesn't act that safely. This is the kind of company that works in the agricultural engineering field, guys that get the job done when

---

[108] The testimony of Plaintiff's witnesses Jeffrey Immel, Jeffrey Martin, and George E. Ley, III provided no direct evidence of when the guard was removed and, thus, all counsel argued as to what the jury should draw circumstantially from such testimony. See N.T. 6/5/2018 at 44: 14-24; N.T. 6/5/2018 at 122-123; N.T. 6/5/2018 at 135:8-21; N.T. 6/5/2018 at 148-149; N.T. 6/5/2018 at 171-172; N.T. 6/5/2018 at 186:8-18.

[109] N.T. 6/19/2018 at 51-52.

they're out there. But there wasn't any evidence from the witnesses we heard on this stand, from the depositions we took, from the investigation conducted that they ever took it off. The only suggestion from the evidence what the circumstantial evidence shows is that it was likely done beforehand.[110]

In response to Plaintiff's summation to the jury, the Turf Defendants argued the following, which is the basis of Plaintiff's claim of error:

> There are two main entities that are at fault in this accident. Plaintiff is one of them, but the Ley Company is the second one. So the only two things I'm going to talk about before I finish my closing is plaintiff's negligence and the Ley Company's negligence.[111]
>
> [...]
>
> Now, there will not be a specific box to check with regard to Mr. Ley and Mr. Ley's company. But you will be able to assess the liability as to whether their actions are a factual cause. In this case, Mr. Ley, you heard about OSHA violations, had multiple OSHA violation with regard to the Ley Company. First, they didn't give correct training with regard to plaintiff. Second, they had broken pieces of equipment and they allowed them to be on the job site. Third, they had a safety manual and they didn't follow the safety manual. Four, they were supposed to have somebody inspect this tractor every day. Do you remember that testimony, every morning before we use the equipment, you're supposed to have somebody sign off that the equipment is safe. Four issues. You're going to be asked what was the factual cause of this accident. Was it my client's negligence or alleged negligence a factual cause. You can check no because the factual cause of the accident is the Ley negligence, as opposed to my client's negligence.[112]

Moreover, Plaintiff used his rebuttal to further address the Turf Defendants' liability defense, as follows:

> You were told and Mr. Fowler mentioned it at the end a lot about George Ley Company and as he mentioned, they're not on the verdict sheet. They're not a party for you to consider. Can't sue your employer. They're not there to assess damages against. The parties in this case and their conduct was a factual cause of this accident. And that's the key language. They spoke to you about cause. You're going to be asked questions about whether each defendant's conduct was a cause. The reason there is not just one party here, there is a reason why there are often multiple parties is because when something goes so wrong there are often multiple causes. And in this case there are. So when you get to those questions

---

[110] N.T. 6/19/2018 at 56-57.
[111] N.T. 6/19/2018 at 162-163
[112] N.T. 6/19/2018 at 165-166

51

about was their conduct a cause or was the defect a cause, it doesn't have to be the only cause. It was a substantial factor that played a role. It was a cause.[113]

The argument of the Turf Defendants did not violate the Fair Share Act, the Workers' Compensation Act, nor any of the governing case law of this Commonwealth. Ley did not appear on the verdict slip in any capacity – not as a party nor for any apportionment purpose – and this Court's instructions clearly defined the parameters of factual cause for the jury.[114] The argument flowed from evidence properly admitted at trial and thus, no error can be found in this Court's denial of the Motion in Limine.

### 4c. Closing argument of MM Weaver

As part of his contention that the conduct of Ley should not have been allowed as evidence at trial, Plaintiff has raised the specific claim of error concerning portions of the closing remarks of MM Weaver. This Court has found any claim related to MM Weaver's closing remarks to be waived as no objection was made at trial and cannot now be laundered into a permissible claims of error through the Motion in Limine.

### 5. The trial court properly admitted evidence of Plaintiff's prior bad acts / character

As Plaintiff's last claim of error, Plaintiff submits that this Court improperly allowed the defendants to utilize evidence of Plaintiff's prior bad acts/character in violation of Pa.R.E. 404(b) and pre-trial rulings on Plaintiff's Motions in Limine. This Court disagrees. Plaintiff filed two Motions in Limine seeking to preclude the defendants from introducing evidence, testimony, or argument regarding Plaintiff's prior convictions and/or arrests (Control No. 18052305) as well as

---

[113] N.T. 6/19/2018 at 172.
[114] N.T. 6/19/2018 at 225-227.

52

his prior drug use (Control No. 18052317), which this Court granted in part on June 4, 2018. Specifically, on Control No. 18052305, this Court ruled that the defendants were precluded from mentioning, arguing, and/or referencing any prior criminal arrest or conviction of Mr. Timmonds, unless such information was proven to be relevant to the testimony of the vocational experts. On Control No. 18052317, this Court ruled that the defendants were precluded from offering any evidence, testimony, or argument regarding or referencing Michael Timmonds' 2012 guilty plea for possession of a controlled substance and drug paraphernalia and/or the allegedly failed 2001 drug test, unless, at trial, such evidence was proven to be relevant to the testimony of the vocational experts or to life expectancy.

Rule 404(b)(1) of the Pennsylvania Rules of Evidence states that, "[e]vidence of a crime, wrong or other act is not admissible to prove a person's character to show that on a particular occasion the person acted in accordance with the character."[115] However, Rule 404(b)(2) provides that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[116] Admission of evidence under Rule 404(b)(2) is, of course, constrained by the balancing analysis of Rule 403 wherein, the court may exclude relevant evidence "if its probative value is outweighed by a danger of [. . .] unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time or needlessly presenting cumulative evidence."[117] Plaintiff cites to our Supreme Court's holding in *Commonwealth v. Chmiel*[118] to support his averment that the defendants violated Rule 404(b) at trial. In *Chmiel*, the Court ruled that evidence of a prior burglary was properly excluded using Pa.R.E 404(b) in conjunction with Pa.R.E. 608(b) because there was no

---

[115] Pa.R.E. 404(b)(1).
[116] Pa.R.E. 404(b)(2).
[117] Pa.R.E. 403.
[118] 889 A.2d 501 (Pa. 2005).

conviction of the prior uncharged burglary and the probative value of the uncharged burglary to "show an action in conformity herewith" was outweighed by the potential for unfair prejudice, confusion of the issues, or misleading the jury.[119] The Court did, however, permit the witnesses to be impeached with their prior convictions for arson-related offenses under Pa.R.E. 608(b) in order to attack their credibility.[120] While *Chmiel* speaks to the function and purpose of Pa.R.E. 404 and demonstrates the interplay of our evidentiary rules, it is not dispositive of the factual scenario in the present case.

Plaintiff's claims of error stem from three instances in which he alleges that this Court permitted the defendants to refer to prior bad acts evidence, excluded by the Motions in Limine, in violation of Pa.R.E. 404. The first alleged violation relates to the portion of MM Weaver's opening statement where counsel stated that "Mr. Timmonds has not always colored within the lines [. . .]" The full context of the remark is reflected in the transcript as follows:

> In terms of the damages side of things and Mr. Timmonds himself, I'm not -- I love my job. There is aspects of it I don't like. One of them is saying negative things about people. I will try not to say very much negative about Mr. Timmonds. You heard a little bit of it from Mr. Murtagh, but the reality is that Mr. Timmonds has not always colored within the lines during the course of his existence and you will hear more about that. There is no reason for me to beat that to death as we go forward. I think he has $1,454 of documented income during the decade, over the last decade or so. But, again, I'm not going to go too far down that lane. Thank you all for your attention.[121]

Plaintiff requested a mistrial and averred that counsel had referenced the prior bad acts that were specifically precluded by the Motions in Limine to insinuate that Plaintiff had been doing something illegal. Initially, this Court determined that the "color within the lines" statement was too vague to infer anything about Plaintiff's prior bad acts. MM Weaver explained that the

---

[119] *Chmiel*, 889 A.2d at 534-35.
[120] *Chmiel*, 889 A.2d at 535.
[121] N.T. 6/4/2018 at 65-66.

"color within the lines" statement was made in reference to Plaintiff's lack of driver's license, as previously mentioned to the jury concerning his qualifications/training as related to the intended users of the tractor. The remark regarding $1,452 of documented income pertained to Plaintiff working under the table, which was highly relevant to Plaintiff's wage loss claim, *which was still in the case at the time of opening statements.* The mere fact that Plaintiff worked under the table does not make the reference improper. Our caselaw supports the award of lost wages based on income from working under the table, provided that Plaintiff satisfies his burden of presenting "sufficient data from which the damages can be assessed with reasonable certainty."[122] Having determined that MM Weaver's remarks did not reference any prior bad acts, as precluded by the Motions in Limine and Pa.R.E. 404, and that the remarks were relevant to the claims at issue, this Court properly denied Plaintiff's request for relief.

The second alleged violation arose in the course of AGCO's cross-examination of Plaintiff, wherein counsel asked Plaintiff if he had ever used a name other than Michael Timmonds. Plaintiff's counsel objected and now argues that counsel's inquiry insinuated that Plaintiff was less than truthful by having used another name and that counsel's inquiry was an attempt to elicit impeachment testimony concerning Plaintiff's criminal record in another name. Akin to the discussion above, the mere fact that an individual has used alternative names does not implicate him/her in criminal conduct.[123] Furthermore, acknowledgment of Plaintiff's aliases was highly relevant to the trial proceedings to explain why medical records shown to the jury reflected a different name. The medical records included Plaintiff's social security number with the corresponding name "Birdie Johnson." In the course of AGCO's cross-examination, Plaintiff provided evasive answers and counsel objected several times. This Court overruled each

[122] *Crespo v. Hughes*, 167 A.3d 168, 177–79 (Pa. Super. 2017).
[123] *Com. v. Hutchinson*, 25 A.3d 277, 304 (Pa. 2011).

55

objection, indicating that Plaintiff need only provide a yes or no answer to this question.

Specifically, the transcript reflects the following exchange:

[BY MR. MURTAGH:]

Q. [. . .] Is there any other name that you have gone by?

MR. GOODMAN: Objection. They're subpoenaed by a Social Security number, not by a name.

THE COURT: Have you used another name other than Michael Timmonds; yes or no?

MR. GOODMAN: I object to that question, too.

THE COURT: Yes or no. He only has to say yes or no. Overruled.

BY MR. MURTAGH:

Q. Did you ever go by --

A. I don't remember.

Q. Did you ever go by the name of Birdie Johnson?

MR. GOODMAN: Objection.

THE COURT: Overruled.

MR. GOODMAN: May we see Your Honor?

THE COURT: Does it have to do with something we ruled on before? It's yes or no. Nothing more. Did he go by that name?

MR. GOODMAN: Yes.

MR. MURTAGH: No.

THE COURT: It's just yes or no. I understand. I do understand what the objection is and he may answer it yes or no. I'm not saying there could be a further question beyond that.

THE WITNESS: I will say at birth I was given the nickname Bird.

THE COURT: You're saying you were given the nickname Bird. He did have a nickname of Bird.

MR. MURTAGH: That wasn't my question.

THE COURT: That's what his answer is -- stop talking -- that's what his answer is and that's all he needs to answer. Yes, he did have a nickname Bird.

MR. MURTAGH: Your Honor, if I might ask --

THE COURT: I know exactly --

MR. GOODMAN: Michael, there's no question.

THE COURT: When I say that's all he needs to answer, yes, he did go by the nickname Bird.

BY MR. MURTAGH:

Q. Did you ever use the name Johnson?

MR. GOODMAN: Same objection.

THE COURT: Understood. It's overruled. To the same extent that he can provide an answer.

THE WITNESS: I don't know.

BY MR. MURTAGH:

Q. You don't know one way or the other whether you ever used the name Johnson?

56

A. My last name is Timmonds.
Q. Did you ever use the name Johnson?
A. I don't know.
Q. Did you ever use the name Ronald Johnson?
A. I don't know.
MR. MURTAGH: This is kind of a difficult spot. Could we have a moment with you? We would very much appreciate it.
THE COURT: No. You may continue. He doesn't know. He told you that there is lots of things he doesn't remember. We will put this in one of those categories and move along.
MR. MURTAGH: I have nothing else for right now.[124]

This Court properly limited the scope of the questions to allow AGCO to demonstrate that the medical records displaying another name were, in fact, those of the Plaintiff. No further questions were asked that alluded to Plaintiff's prior bad acts under a different alias. As such, there was no violation of Pa.R.E. 404(b) or this Court's pre-trial rulings and this Court properly overruled Plaintiff's objections.

The final alleged violation arose in the course of the Turf Defendants' cross-examination of Plaintiff, wherein counsel asked Plaintiff about his employment history and the type of work he had performed. Plaintiff was not forthcoming in his responses and refused to provide the last name of his prior business partner. The transcript provides:

[BY MR. FOWLER:]
Q. So I don't think we covered a lot of questions about your work background, so let me ask you a couple of questions about that, okay. So in your lifetime, what kind of jobs did you hold?
MR. GOODMAN: Your Honor, there's not a vocational claim. I object to relevance.
THE COURT: I understand. It's just general background for the jury to evaluate the time.
MR. FOWLER: Exactly.
THE COURT: You will not spend a lot of time on it, but generally what did he do for work.
BY MR. FOWLER:
Q. What did you do before?
A. I worked numerous of jobs. I can't give you any specifics like the time I started or when --

---

[124] N.T. 6/6/2018 at 79-82.

**THE COURT:** I think the question is just asking very generally, even if you don't remember the years and all of that, what you did.

**BY MR. FOWLER:**

**Q.** Were you -- I jokingly say to people were you a butcher, a baker or candlestick maker? What did you do for a job, what was your living?

**A.** It was just any available line of work. I can't give you any specifics other than when I was just working for George Ley. I think we can keep it as that.

**Q.** Let's talk a little bit more stuff. Were you in the construction industry?

**A.** There is a lot of things that I have done since I started working.

**Q.** Great. Tell us about those. What did you do for work before Mr. Ley?

**A.** I can't talk about specifics. In regards for working for George Ley? I don't think I have to get into details of what other work I got, but I have worked off and on.

**Q.** My question is -- I'm not going to ask you for specifics regarding dates, but, generally, tell me what line of work were you in before you went to work for Mr. Ley. What did you do for a living, what was your occupation, if you had to put that down on some type of form?

**A.** We can go as far as in my lifetime, I have been a laborer.

**Q.** What type of laborer were you, sir? What kind of areas did you work in?

**A.** General labor.

**Q.** I understand that.

**A.** I can't give you any more than of what I have done general labor, sir.

**Q.** You gave them to us in the deposition. Is there some reason that you can't give them to us today?

**A.** Because there is many jobs I had off and on. I mean, that's what I can tell you.

**Q.** Just please tell us the last job that you had or the last occupation or the last line of work that you had --

**A.** I can't give you any specific dates.

**Q.** I don't need specific dates. I understand that you don't have specific dates. I won't ask you for those, I promise. All I'm asking for is before the Ley job, what were you doing for a living, what was your job?

**MR. GOODMAN:** At which time with Ley? He started there in 2001 and came back. I don't know which time.

**MR. FOWLER:** At this point I will take any.

**THE COURT:** Anything that you can remember.

**THE WITNESS:** Always been a general laborer. That's all I can give you a straight answer to, sir.

**BY MR. FOWLER:**

**Q.** You were working as a general laborer for a company that does irrigation. Before you were working for a company that does irrigation work, what were you doing general labor-wise? Here's why I'm asking. I want to ask other questions about your general knowledge in the construction industry. What I'm asking for is what] area before working in irrigation did you work in?

**A.** Just general laborer. I mean, I'm just going to give you the same answer. I mean, in regards because that can be to anything on the in or -- no, I'm sorry. On

58

the outside or inside field. I was just a general laborer. Could you please accept my answer as that?

Q. So my understanding from your deposition was that you and another man had a company in which you did construction work together for a number of years, correct?

A. Yes.

Q. What was the name of the other man? Do you not want to tell me?

MR. GOODMAN: Objection.

MR. FOWLER: I'm asking because he's looking at the Judge.

THE COURT: Can you remember the name of the person?

THE WITNESS: I can give you the first name if that's what you want.

BY MR. FOWLER:

Q. I would like the full name. If you don't remember his full name, that's okay.

A. His name is Dave.

Q. What is Dave's last name?

A. Handyman services.

Q. What is his last name?

A. I'm not going to go there.

Q. Why?

A. Because he's not present maybe he wouldn't want me to give his last name.

Q. I realize he's not present. But I don't understand why you wouldn't want to tell me who your partner was in a business.

MR. GOODMAN: Objection; relevance.

THE COURT: Here's what I'm going to say, I know that my jury's lunches have come in the back and I'm just going to try to find out, maybe I can. Let's find out what the name is and then let Mr. Timmonds know what we are doing here. Because I'm not sure -- I will tell my jury that, obviously, he's being asked some questions and I don't know whether there is some privilege or privacy for this Mr. Dave person that he may have. People do have privileges. I don't know what they are. So there may be some things that I need to ask and so what I'm going to ask my jury to do is take a 20-minute break.[125]

Plaintiff's counsel objected and defense counsel explained that the questioning was to understand the areas in which Plaintiff previously worked in order to demonstrate his general knowledge of the industry and familiarity with heavy machinery, like the at-issue tractor. This questioning related to his work history and business partner did not reference or infer anything about prior convictions or bad acts. Any negative inferences to be drawn from Plaintiff's testimony were created by his own evasive manner and/or refusal to answer particular questions. Moreover, in

---

[125] N.T. 6/6/2018 at 87-93.

addressing the objection outside of the presence of the jury, this Court preemptively instructed defense counsel that Plaintiff *had not* opened the door to questioning about his criminal record, thereby preventing any improper inquiry of the witness.[126] Accordingly, Plaintiff's claim that this Court erroneously admitted evidence of prior bad acts is unsupported by the record and did not constitute a violation of Pa.R.E. 404(b) or this Court's pre-trial rulings.

## CONCLUSION

For the reasons set forth in this Opinion, Plaintiff's Post-Trial Motion for a New Trial is **DENIED**.

BY THE COURT:

CARPENTER, J.

---

[126] *See* N.T. 6/6/2018 at 104-107 (providing argument and ruling related to Plaintiff's criminal record).